SETH S. SUMMERSON *vs.* FERDINAND SCHILLING,
JR., ET AL., JUDGES OF ELECTION, ETC.

*Elections and Voters—Application for Mandamus to Compel Judges of
Election to Assist Illiterate Voter—Repeal of Law Providing for
Assistance—Removal of Case from Court of Law to Equity.*

The Act of 1901, ch. 2, enacted that voters not disabled by blindness or physical injury from marking their ballots shall not be entitled to assistance in so doing, and repealed that part of the Act of 1896, ch. 202, which had provided that voters who had been previously registered as

unable to read or write should be entitled to the help of the Ballot Clerks in marking their ballots. The petitioner in this case asked for a writ of *mandamus* to compel the Judges of Election and the Ballot Clerks in the precinct in which he was registered to take his affidavit that he could not read or write and give him assistance to enable him to mark his ballot as an illiterate voter at the election to be held on November 5th, 1901, or at any other election to be held during the ensuing year. This petition was dismissed by the lower Court on November 25th, after the election referred to. *Held*, that the writ was properly refused not only because it would have been nugatory and of no avail if issued, but also because, even if the Act of 1901 had not been passed, there was and had been no statute which authorized or required the Judges of Election to take petitioner's affidavit when he offered to vote that he was illiterate and to assist him in marking his ballot, or which authorized the clerks to mark the ballot unless the person asking for such assistance had been previously registered as an illiterate voter.

Code, Art. 26, sec. 42, authorizes the removal of cases from a Court of law to a Court of equity and *vice versa* in the discretion of the Judge presiding in the Court in which the suit is pending. *Held*, that no appeal lies from a refusal of a trial Court of law to direct the removal of the case to a Court of equity.

Appeal from an order of the Court of Common Pleas (PHELPS, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Henry W. Williams* and *R. E. L. Marshall*, for the appellant.

The qualifications requisite to entitle a person to vote are prescribed by the Constitution of the State, and the right of suffrage having been thus granted by the sovereign power of the State to all those persons possessing the prescribed qualifications, can neither be restricted nor extended, altered nor amended by legislative enactment. 10 *Am.& Eng. Ency. of Law*, 573; *Cooley's Cons. Lim.*, 753. In such case the Legislature may *regulate* the exercise of the right so conferred by the Constitution, but can not, under the guise of regulation, introduce any provision which directly or indirectly adds to or subtracts from the qualifications of voters as fixed by the Constitution. 10 *Am. & Eng. Ency. of Law*, 580; *Ransom* v. *Black,*

54 N. J. L. 446–451; *Pearson v. Supervisors*, 91 Va. 322–331. Constitution, Art. 1, sec. 1, provides that every male citizen of the United States of the age of 21 years or upwards, who has been a resident of the State of Maryland for one year, and of the legislative district in which he may offer to vote six months, *shall be entitled to vote* at all elections hereafter to be held in this State. Sex, age, citizenship and residence are, therefore, the only qualifications *expressly* required, and unless there be some additional *implied* qualification, it follows that the possession of these *vests* in a person the right of franchise, the exercise of which may be *regulated* by the Legislature, but cannot be restricted or enlarged.

It might be argued that the provision of this Article, that all elections shall be by ballot, implies as a qualification the capacity to vote by ballot. If this be true, it must be assumed that *capacity* or *ability* to use the ballot is a constitutional qualification equally as necessary to the right to vote, as the possession of the express qualifications of the Constitution. But this implied qualification must be rejected. If it arises at all, it must apply generally and universally. It must be a test to which the right to vote of every person is to be subjected. It must apply to physical incapacity as well as to the incapacity of ignorance; to the halt, the lame and the blind, as well as to the uneducated and illiterate, to the man who has lost his eyes, as well as to the man who has not been taught to use them. But this construction has never prevailed in this State.

The present Constitution was adopted in 1867, and in every election law passed subsequent thereto, including the Act of 1901, provision has been made for assisting those, who in other respects qualified to vote, are unable to cast their ballot without assistance, by reason of physical incapacity, such as blindness, physical injury, etc. Ch. 2, Acts of 1901, sec. 67.

Moreover, in some of the election laws passed since the adoption of the Constitution, notably Art. 33 of the Code of Public General Laws, provision was made for assisting those who, by reason of their ignorance, were unable to vote alone. It should also be noted that this constitutional provision related

to ballots prepared outside of the polling place by the voter, with or without the assistance of his friends, while the present law compels the use of a ballot prepared by the State. It follows, therefore, that to imply an additional qualification from this provision is opposed to all legislative construction put upon it, contemporaneous, subsequent and present, and it is not necessary from the language of the provision itself. Moreover, if it be held to raise such additional qualification it is submitted that the provision of the present law, giving assistance to those physically incapacitated, is unconstitutional and void.

· It is submitted, therefore, that the only qualifications necessary to a right to vote are those *expressly* enumerated in the Constitution, and that the possession of these vests in a person the right to participate in all elections, which right cannot be restricted or enlarged by any Act of the Legislature.

· Looking to the pleadings in the case, it appears that the appellant possessed all the required qualifications at the time he applied to the appellees to be registered. He had, therefore, a vested right to participate in the election ensuing, as well as any other election that might be held in the State. If then, this vested constitutional right is destroyed, or in anywise abridged by legislative enactment, the provisions of the law so infringing the Constitution must fall. Section 62 of ch. 2 of the Acts of 1901, provides that no assistance in marking their ballots shall be given any voters, except those disabled by blindness or physical injury. The appellant being neither blind nor physically disabled, is not, therefore, entitled under this provision to receive any assistance. But he alleges, that unless he is given assistance or is permitted to obtain assistance, he will be unable to mark his ballot, because by reason of his want of education he can neither read nor write, and is therefore unable to mark his ballot without assistance.

· The question is thus presented whether, as a matter of constitutional right, an illiterate person, otherwise a legally qualified voter, is entitled to assistance in marking his ballot, and by this it is not intended to say that assistance must necessarily be provided for by law, but only that, if it be a constitu-

tional right, the person entitled thereto shall not be absolutely denied it by law.

It is apparent that a person who can neither read nor write must either be provided with some means of casting his ballot, or permitted to provide the means himself, or, as the only other alternative, be disfranchised. The printed names on the ballot furnished no assistance, because he can not read them, by reason of his illiteracy. It is beside the question to say that he can learn to read, and that the good of the many demands that he must learn if he wishes to vote. This, in effect, is equivalent to the creation of an educational qualification upon the right to vote. It is an attempt by the Legislature to say that a man who cannot read cannot vote, in the face of the declaration of the Constitution that a man who cannot read can vote, provided only he possesses the qualifications prescribed by the Constitution. To hold, therefore, that an illiterate shall not receive any assistance other than that conveyed by the printed matter of the ballot is to restrict by legislative enactment the right of suffrage granted by the Constitution, by the addition of a qualification not prescribed in the Constitution. But such legislation is unconstitutional, null and void. 10 *Am. & Eng. Ency. of Law,* 580.

This precise question was raised in *Rogers* v. *Jacobs,* 88 Kentucky, 502, 508, where a provision requiring each voter to retire to a compartment and there alone and unaided indicate by a mark on his ballot the names of the candidates for whom he wished to vote, was held to be inoperative, because it deprived those unable to read or write of a free and intelligible choice, and in fact made free suffrage as to them as a matter of chance or accident. So in Michigan, where no means of assistance was provided for by law at the polls, it was held that illiterates and those physically disabled were entitled to receive and have their tickets prepared outside the polling places, as otherwise they would be disfranchised. *Detroit* v. *Rush,* 82 Mich. 532. See also the recent case of *Pearson* v. *Supervisors, etc.,* 91 Va. 322, 331.

The theory of *Cook* v. *State,* 90 Tenn. 407, is, that by a

sufficiently careful study beforehand, an illiterate, without actually learning to read, may yet impress the printed names upon his mind, as he would a picture, so as to be able to recognize them at sight. Without discussing the soundness of this conclusion, opposed as it is to the cases above cited, it is submitted that it can have no application in this State, by reason of the provisions of sec. 49 of our election law, whereby the constitutional right of every voter is recognized to write upon the ballot the name of any person for whom he may desire to vote, and whose name does not appear upon the ballot as a candidate, for any office to be filled at the election.

While it might be possible for an illiterate and uneducated person to so familiarize himself with various collections of, to him, meaningless hieroglyphics, as to be able to recognize among the names of all the candidates upon a ballot the particular names for which he desires to vote, it can hardly be contended that he could become familiar enough with letters to *write* the names of such persons as he might wish to vote for, but whose names do not appear upon the ballot, and yet remain illiterate. The ability so to do necessarily involves the ability to write, but to require this as a condition to voting is only to impose upon the right of suffrage the qualification of education.

It is submitted therefore that a law which neither furnishes any means in itself of aiding illiterates, who are legally qualfied voters, in the preparation of their ballots, nor permits them to obtain assistance from sources outside, the law, in effect, disfranchises the illiterate voter, and makes free suffrage as to him a matter of chance or accident. Looking then to sec. 62 of ch. 2 of the Acts of 1901, it appears that assistance in marking their ballots may be given only to the blind and physically disabled, and voters who are not blind or physically disabled shall not be entitled to receive any assistance in marking their ballots. "And with the exception in favor of persons blind or incapable from physical injury of marking their ballots without assistance no distinctiou or discrimination in the matter of assistance in marking ballots shall be

made for or against any duly registered voter for any other cause whatever."

This is, in express language, a denial to every person, who is neither blind nor physically disabled, of the right to receive any assistance at the polls. It is, therefore, a denial of the right to the illiterate. By section 61, after the Judge of Election has delivered to the voter his ballot, "he shall forthwith, and without leaving the enclosed place, retire alone to one of the booths or compartments and prepare his ballot. etc." The voter is, therefore, by the terms of the law, prohibited from obtaining any assistance in marking his ballot outside of the polls. It follows that the illiterate voter being forbidden to obtain assistance in marking his ballot, either from the officers of election at the polls or from persons outside the polls, must necessarily be disfranchised, unless there be, somewhere in the law, some effective method of rendering him the assistance required to mark his ballot.

It follows inevitably that sec. 62, by denying any assistance to the illiterate voter, imposes a qualification upon the right of suffrage additional to the qualifications prescribed by the Constitution, and must, therefore, be declared null and void. But the consequences of annulling sec. 62 of ch. 2 of the Acts of 1901 is to revive sec. 62 of Art. 33 of the Code of Public General Laws. Ch. 2 of the Acts of 1901 is entitled "An Act to repeal and re-enact with amendments secs. 15 and 16 of Art. 33 of the Code of Public General Laws * * * and to repeal and re-enact with amendments secs. 54, 61 and 62 of said Art. 33, etc." Sec. 62 of ch. 2 of the Acts of 1901 is, therefore, equivalent to an Act to *repeal and re-enact* sec. 62 of Art. 33 of the Code of Public General Laws, and being itself unconstitutional and void, the repealing clause must fall along with the re-enacting clause, and the section attempted to be repealed is restored to full operation and effect. *State* v. *Benzinger*, 83 Md. 481.

If it is held that while an illiterate is entitled to receive assistance, and, consequently, so much of sec. 62 is void, as being unconstitutional, which attempts to deprive him of this

right, nevertheless all the provisions of sec. 62 are not void, but only those which conflict with this constitutional right, the effect would be to establish the right of the illiterate to assistance, but to provide no particular persons by whom or manner in which it should be given. In other words, the consequence of such construction would be to leave the law silent on the question of assistance while admitting the existence of the right. In such case, of course, *mandamus* would not lie, and having in view this possible theory, the petitioner, upon the overruling of his demurrers made a motion to amend his pleadings from a proceeding by way of *mandamus* to a proceeding in equity, where obviously remedy might be had in such case. This motion was overruled and the order thereon forms a part of this appeal. That this was an undoubted right is clear. *Code*, Art. 75, sec. 34.

*Bernard Carter* and *John Prentiss Poe*, for the appellees.

1. Inasmuch as the election was over when, on the 25th of November, 1901, the case came on to be heard, and the Court was called on to issue the *mandamus* prayed for, the *mandamus* was properly refused, because, if granted, it would have ordered the appellees to do something which it was beyond their power to do, and that the Court, according to the well-settled practice in such a state of case, would never by *mandamus* seek to compel parties to do a nugatory act or order them to do something which it was manifestly impossible for them to do. *Commissioners* v. *Commissioners*, 20 Md. 449; *State* v. *Regester*, 59 Md. 289; *Wells* v. *Hyattsville*, 77 Md. 125; *Brown* v. *Bragunier*, 79 Md. 236.

2. The *mandamus* was properly refused, because upon material matters of traversable fact admitted by the demurrers, as well as because no proof was offered of material facts of which proof was demanded, the petitioner was not entitled to the *mandamus* which he prayed.

3. The original prayer of the petitioner commanding the four appellees Schilling, Thomas, McGraw and Krebs, as Judges of Election, to give to the appellant "proper assist-

ance to enable him to mark his ballot," was too vague and indefinite, and, moreover, that the *mandamus* asked for manifestly involved more than the performance of a merely ministerial duty.  *Green* v. *Purnell,* 12 Md. 329; *Wailes* v. *Smith,* 76 Md. 476.

4. So far as the *mandamus* sought to compel the Judges of Election to give to the appellant " proper assistance to enable him to mark his ballot," it was properly refused for, the reason that by sec. 62 of the law existing prior to its repeal and re-enactment by the Act of 1901, the Judges of Election had no authority to give assistance to voters.

This point was urged by counsel for the original appellees at the hearing below, and the fact that the counsel for the appellant, after JUDGE PHELPS had delivered his oral opinion overruling the demurrer of the appellant to the answers of .these four appellees, Schilling, Thomas, Krebs and McGraw, asked leave to file an amended petition making the election clerks co-defendants, demonstrates that the correctness of this view was and is conceded by counsel for the appellant.

.   It follows, therefore, that if sec. 62 had not been touched at all by the Act of 1901, and sec. 16 alone had been amended as it was and is amended by that Act, the judges would have had no authority to receive the declaration of the appellant under oath that he is unable to read.   The contingency upon which alone the judges are entitled to receive the oath of a voter that he is unable to read, is that such inability shall have been declared by the voter at the time of his registration, and that it shall be so entered on the registers, and it is accordingly quite clear that as in this case such inability was not stated by the appellant at the time of his registration, and was not so entered upon the registers in accordance with the provisions of sec. 16, Act of 1901, ch. 2, the Judges of Election have no lawful right to administer the oath in question to the appellant or to receive any affidavit from him touching his inability to read as an absolutely essential requisite to his receiving any assistance from the clerks under sec. 62 as it stood prior to its repeal by the Act of 1901, ch. 2.

But, apart from all these objections, and assuming for the sake of the argument, without conceding, that the question of the constitutionally *vel non* of sec. 16 of the Act of 1901, ch. 2, is fairly presented by the record in No. 19, and that the question of the constitutionality *vel non* of sec. 62 is fairly presented by the record in No. 32, or that the constitutionality of these two sections, if not presented by these two records separately, may fairly be claimed to be presented by these two records combined, we respectfully contend that these two sections are entirely free from valid objection.

In discussing the constitutionality of an Act of Assembly, we must bear in mind certain well-settled principles, nowhere more thoroughly established than in Maryland. *First.* That all laws duly enacted are presumed to be constitutional, and that no law shall be adjudged to be unconstitutional, unless it be in direct and clear conflict with the written Constitution. Where the question is fairly doubtful, the respect which the judicial department owes to the legislative department of the State requires that the Act assailed as unconstitutional should be upheld by the Courts as valid. *Williams* v. *Regents*, 9 G. & J. 383; *State* v. *B. & O. R. R. Co.*, 12 G. & J. 438; *Mayor, etc.*, v. *State*, 15 Md. 435–6; *Harrison* v. *State*, 22 Md. 468; *Anderson* v. *Baker*, 23 Md. 531; *Davis* v. *Helbig*, 27 Md. 452; *Groff* v. *Mayor*, 44 Md. 67; *County Com.* v. *Meekins*, 50 Md. 39–40.

*Second.* That in judging of the validity of a State statute, the question is not whether power either expressly or by fair implication is given to the Legislature to pass it, but the question is whether the Constitution anywhere *prohibits* the passage of such law. The Legislature is the depository of all legislative power, and it has authority as such depository to pass any law which is not prohibited by the Constitution, either in express terms or by fair implication. *Mayor, etc.*, v. *State*, 15 Md. 388.

*Third.* The whole statute must be considered and not detached portions.

Applying these principles to the two sections of the Act of

1901, ch. 2, which are claimed to be unconstitutional, viz: secs. 16 and 62, all difficulty disappears.    There is no express provision in our Constitution which denies to the Legislature the power to pass the two sections here assailed.    This is conceded.    And we say that there is nowhere to be found such denial by any implication from any clause in the Constitution. The counsel for the appellant base their contention upon an argumentative inference or implication from the provision of sec. 1 of Art. 1 of the Constitution, which declares that every male citizen of the United States who has resided in Maryland for one year shall be entitled to vote, etc.    Under this implication they insist that the appellant has a constitutional right to be asked to state under oath when he applies to have his name registered as a qualified voter whether he can or cannot read, and to have his answer to this question recorded.    And that because sec. 16 of the Act of 1901, ch. 2, does not require the officers of registration to put this question to him, the section is unconstitutional and void.    They further contend that as the appellant claims that he is unable to read he has a constitutional right to call on the two election clerks to assist him in marking his ballot in the voting booth on election day, and that because sec. 62 does not provide that such specific assistance must be then and there given to him this section is also void.

*a.* As to the alleged constitutional right of the appellant to require that the registration officers shall question him under oath as to his ability or inability to read and their duty to record his answer.    The Constitution, Art. 1, sec. 5, declares that "the General Assembly shall provide by law for a uniform registration of the names of all the voters in this State who possess the qualifications prescribed by this article," etc., etc. It does not require that in the registration thus ordered to be provided for by law such question shall be asked and answer recorded, nor does it contain any prohibition against the omission of such question in any statute passed to carry out this direction of the Constitution.    Hence the Legislature is left wholly free to prescribe such regulations and details in the

registration as it shall deem expedient, provided it carries out the requirements of the Constitution.

Accordingly, in all the registration acts passed since 1867 down to 1896, ch. 202, no such question has been required to be put. It is directed to be put in sec. 16 of that Act, but in sec. 16 of the Act of 1901, ch. 2, it is omitted.

*b.* As to the constitutional right of the appellant to demand that the election clerks shall assist him in marking his ballot in the voting booth on election day. The Constitution nowhere *requires this assistance* to be given. Nor does it anywhere *prohibit* the Legislature from passing any law that omits to provide for the giving of *such assistance.* It is absolutely silent on the subject. Hence this matter of detail must be held to be left to the absolute discretion and judgment of the Legislature, provided what is done is in keeping with the requirements of the Constitution. The Legislature of 1890 and the Legislature of 1896 thought it expedient to provide for the giving of such *specific* assistance. The Legislature of 1901 thought it expedient to withhold that specific method of assistance, but to substitute for it other assistance to voters who cannot read which it believed was adequate and sufficient.

The demurrers admit that such substituted assistance is ample *in fact.*

How then can the present section 62 be unconstitutional ? It withholds the specific assistance provided in sec. 62 of the Act of 1896, which it repeals and re-enacts, but the Act of 1896, ch. 202, and the Act of 1901, ch. 2, of which this section is a part, in other sections, furnish all reasonable assistance. See sections 44, 49, 52, 114A.

However, the question, whether the Court has the power to declare that the assistance which the Legislature decides to be sufficient and reasonable, is not sufficient and reasonable, would be decided, if raised, it is not necessary to determine in passing upon the constitutionality of the Act of 1901. There is nothing in the Constitution which expressly limits in any way the power of the Legislature on this subject. There is no clause which expressly prohibits the withholding of as-

sistance altogether, and there is no clause which denies to the Legislature the power to give assistance if it sees fit to give it.

Section 62 of the Act of 1901 does not deny or abridge *the right* of suffrage. It applies equally to all races and conditions, and provides that with the exception of persons who are blind or physically disabled, no assistance shall be given to voters in marking their ballots. Now, in the absence of some provision in the Constitution which directs such assistance to be given at the polls, in the voting room, by election officials, where can we find any invalidity in this section? If the statute may, without violation of the Constitution, omit to furnish to the sick or lame the means to reach the polls so as to vote, why may it not be equally as well to withhold assistance in the polling room from those who cannot read when they reach the polls.

The alleged disability to cast the ballot is not created by the statute. It is in the voter himself. Ample opportunity is given to him to vote. If by his misfortune or neglect he cannot use this opportunity the fault is not to be imputed to the statute, but to himself. The Constitution gives the right to all male adults to vote, but it equally clothes the Legislature with power to regulate how that right shall be exercised. It commands that it shall be *by ballot* and it in express terms declare that the Legislature shall have power to regulate *all* matters which relate to time, place and *manner* of holding elections, etc., that is to say, in casting and counting the ballots. The manner in which and by whom the ballot shall be marked so as to be entitled to be counted is surely within this express power.

Nor is there any ground for claiming that the Act of 1896, ch. 202, as amended by the Act of 1901, ch. 2, is unconstitutional, because it fails to make proper provision to enable those entitled under the Constitution to the elective franchise, to exercise this right. If it be admitted that the Legislature of Maryland, under its Constitution, is not entitled to determine, without question by the Courts, what are reasonable provisions in this regard, yet the most that can with reason be

claimed is that the provision of the statute must *not* be so unreasonable as, in effect, to *destroy* the right conferred by the Constitution, but must be such as to make the exercise of the right practicable. *City of Detroit* v. *Rush*, 82 Mich. 537, 538; *Cook* v. *State*, 90 Tenn. 412, 413, 414; *Moore* v. *Sharp*, 98 Tenn. 494.

Ample opportunity is afforded by the provisions of the statute to all persons entitled to vote, whether illiterate or not, to exercise this right if they make reasonable use of the opportunity that is given, under the provisions of the statute, to learn how to cast their votes. We submit that an examination by the Court of the several provisions of the statute will leave no doubt on this point. Indeed, so far as the case now before the Court is concerned, if it was necessary to insist upon the point, the pleadings admit that reasonable assistance is given by the provisions of the statute. But assuming that in face of the demurrers the appellant is at liberty to dispute this point, we maintain that the provisions in the Acts already referred to do give, in fact, ample and reasonable assistance.

BOYD, J., delivered the opinion of the Court.

The appellant filed a petition in which he prayed for a writ of *mandamus* against Messrs. Schilling, Thomas, McGraw and Krebs, Judges of Election of the 9th Precinct of the 10th Ward of Baltimore City, "commanding them to give unto your petitioner proper assistance to enable him to mark his ballot at the ensuing general election to be held on the 5th day of November, 1901, or at any other election to be held during the ensuing year." The defendants answered and amongst other things stated that Judges of Election had no authority under the Act of 1901, ch. 2, or under any pre-existing law, to give assistance to the petitioner in marking his ballot. The appellant then obtained leave to file an amended petition in which he made defendants the Judges of Election and the two ballot clerks for that precinct. In that he asked for a *mandamus* against the Judges of Election commanding them to take his

affidavit that he cannot read or write, "at the ensuing general election to be held on November 5th, 1901, or at any other election to be held during the ensuing year," and against the two ballot clerks commanding them to mark upon the ballot of the petitioner the names of the candidates for whom he shall desire to vote. The petitioner demurred to the several answers and on the 25th of November, 1901, the Court overruled the demurrers. Thereupon the petitioner moved the Court to remove the case to a Court of equity which motion was over-ruled and the petition dismissed. The petitioner then appealed "from the order overruling the demurrers of the plaintiff, deny-ing his motion to have the case transferred to a Court of equity, and dismissing the petition."

Much that we have said in the case of *Summerson v. Schill-ing et al., Board of Registry, etc.,* is applicable to this case. The theory upon which appellant proceeded was that sec. 62 of Art. 33, as amended by the Act of 1901, ch. 2, is uncon-stitutional and void, and hence did not repeal that section as enacted by the Act of 1896, which provided that "any voter who declares under oath to the Judges of Election that he cannot read or write, or that by reason of physical disability he is unable to mark his ballot, and who shall have stated such inability at the time of registering, and is so entered in the registers, shall receive the assistance of the clerks in preparing the same in the manner following, etc. The Act of 1901 pro-vides that voters who are not disabled by blindness or physical disability shall not be entitled to receive assistance. If the Act of 1901, had never been passed, it is manifest that the Judges of Election could not be compelled by *mandamus* to give the petitioner "proper assistance to enable him to mark his ballot," as the law prior to that Act authorized the *clerks,* and not the judges, to give the assistance. That was doubt-less the reason the petition was amended and there can be no question that the writ as prayed for in the original petition could not have been issued, whatever construction be placed on the Act of 1901.

But the same difficulty that existed in the case against the

Board of Registry exists here. This petition was dismissed on the 25th of November, 1901—twenty days after the election. It is manifest that *quoad* that election it would have been nugatory to have issued a *mandamus.* But it is said that the petition applies to the election of November 5th, 1901, "or at any other election to be held during the ensuing year." There is no other to be held during the ensuing year, unless it be said there may be a special election. Is this extraordinary writ to be issued on the mere possibility that there may be a special election? If there is none, then the writ will be utterly unavailing. If there is, it is possible that the petitioner may have learned to read before it is held, and yet if the Court issues the *mandamus* it would be utterly useless under those circumstances, as the petitioner could not truthfully declare under oath that he could not read or write.

But giving section 62, as passed in 1896, all the effect that is claimed for it by the appellant, how could the Judges of Election take the affidavit or the clerks assist the petitioner, under that section? It is only when he "shall have stated such inability at the time of registering and is so entered in the registers" that the judges and clerks are authorized to act. If the Act of 1901 had not been passed, and there was no such entry in the registers in reference to the petitioner, could a *mandamus* be issued against the judges and clerks requiring them to do what is now sought in this case? Manifestly not, and how can it be issued, on the theory of the appellant that the Act of 1901 is unconstitutional—that is to say is not a valid law? There is no statute requiring any of the defendants to do what the Court is asked to require of them, unless it be that section as passed in 1896, and that, as we have seen, only authorizes them to so act under conditions which confessedly do not exist in this case.

It may be that it is not the fault of the appellant that such entries were not made in the registers, but if the petition correctly states the reasons for the refusal of the Board of Registry—that they were obliged to do so by the instructions of the Attorney-General of Maryland—it can scarcely be said

that they are at fault for not making the entry. The fact is it was not entered, and there is nothing in the law to compel the defendants to do what the Court is now asked to require of them, even if the appellant's view be adopted as to the status of section 62. It is therefore wholly immaterial, for the purposes of this case, whether the Act of 1901 be unconstitutional or not, and as we said in the other case that question is therefore not properly before us.

Without stopping to consider whether the statute (Art. 26, sec. 42, as enacted by Act of 1896, ch. 229), for removal of cases from Courts of law to Courts of equity and *vice versa* applies to a proceeding for a *mandamus*, or whether the petitioner could obtain any relief in equity, the statute provides that the case may "*in the discretion of the Judge* presiding in the Court in which the suit is pending" be removed, etc. It being left to the discretion of the presiding Judge, it is not a subject for review by this Court. As such a removal must ordinarily, if not always, involve amendments of the pleadings, and as amendments are in the discretion of the Court, the Legislature was probably influenced by that fact to thus leave the removal to the discretion of the presiding Judge. But whatever its reasons were, it did thus expressly so leave it.

The order of the Court sustaining the demurrer and dismissing the petition will be affirmed.

*Order affirmed, the appellant to pay*<br>*the costs.*

(Decided March 5th, 1902.)