## THE SAFE DEPOSIT AND TRUST COMPANY, Substituted Trustee of the Estate of W. A. TUCKER, *vs.* FRANK B. CAHN et al.—THE SAME *vs.* WILLIAM C. ROBERTS et al.

*Liability of Parties Aiding a Trustee in Misappropriating the Trust Property—Jurisdiction of Equity—Payment of Proceeds of Sale of Trust Property to one of two Trustees Individually—Limited Partnerships—Stock Brokerage Business—Liability of Special Partner to suit in Equity with General Partner After Dissolution of Limited Partnership—Assumption of Liabilities of one Firm by a New Partnership.*

Those who aid a trustee in his misappropriation of the trust funds become themselves trustees of the diverted property, and are liable therefor in a Court of equity, because by becoming trustees *ex delicto* they have brought themselves within the jurisdiction to which the original trustee was amenable.

When a testamentary trustee has been removed because a defaulter and a substituted trustee appointed in his place, the new trustee is authorthorized to maintain a suit in equity against parties who knowingly participated with the defaulting trustee in his misappropriation of the funds of the estate.

A Court of equity in which a trust estate was being administered ordered a sale of certain shares of stock in different corporations, the certificates of which stood in the names of two testamentary trustees. The defendants, a firm of stock brokers, with full knowledge of the trust estate's ownership of the shares, sold them, and paid the proceeds by check to one of the trustees individually, and not as trustee, and he converted the proceeds to his own use without accounting to his cotrustee or to the trust estate therefor. Upon a bill by a substituted trustee to recover the sums so paid by the defendants, *held*, that the defendants are liable to make good to the trust estate the amount which they thus aided the trustee in misappropriating.

*Held*, further, that this liability is enforceable by a bill in equity and the substituted trustee is not remitted to an action at law.

Under Code, Art. 73, sec. 1, authorizing the formation of limited partnerships for the transaction of any mercantile, mechanical, manufacturing or banking business within the State, such a partnership may be formed for carrying on the business of stock brokers since that is a mercantile transaction.

Code, Art. 73, sec. 4, requires the certificate of a limited partnership to be recorded in the office of the Clerk of the Superior Court if the principal place of business of the partnership be in Baltimore City. *Held*, that a limited partnership, when the certificate was there recorded, is not converted into a general partnership merely because its principal office is without the State, when its principal place of busines within the State was located in the city where its certificate was recorded.

Code, Art. 73, sec. 2, provides that a special partner in a limited partnership shall not be liable for the debts of the firm beyond the amount of his cash contribution to the capital; and sec. 19 directs that all suits respecting the business of the partnership shall be brought by and against the general partners only. *Held*, that the provision in sec. 19 must be construed to apply to suits brought while the firm is a going concern and to suits brought after its dissolution but while the special partner's cash contribution still forms part of the assets, or has been wholly absorbed in the liquidation of debts due by the firm.

While a limited partnership was in existence the firm aided a trustee in converting to his own use the trust property and thereby became liable to make good the loss to the trust estate. Afterwards the firm was dissolved and the special partner's contribution to the capital was restored to him in full. *Held*, that the special partner may be sued in equity jointly with the general partners to enforce this liability of the limited partnership.

A firm of stock brokers became liable to restore to a trust estate the amount they had aided the trustee in misappropriating to his own use. Upon the dissolution of this firm a new one was formed which assumed all the liabilities of the former. *Held*, that the liability of the first partnership to the trust estate was an obligation assumed by the new firm, and also that both firms can be held therefor.

When a trustee, who is directed by an order of Court to sell certain shares of stock at the public stock board, sells them at private sale, the purchaser takes the shares impressed with the same trust to which they were subject in the hands of the trustee.

Appeal from the Circuit Court of Baltimore City (DENNIS, J.)

The cause was argued before McSHERRY, C. J., BRISCOE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*Bernard Carter* and *Frank Gosnell* (with whom was *Geo. Weems Williams* on the brief), for the appellant.

*Edgar H. Gans* and *Robert B. Honeyman*, for the appellees.

McSHERRY, C. J., delivered the opinion of the Court.

There are three appeals in this record. Two of the questions brought up for decision are involved in all of the cases, whilst there are separate, subordinate inquiries which are confined to the first and third appeals respectively. Before stating any of the questions which are to be considered, a brief narration of the facts must be given, in so far as they affect the first contention which is common to all the cases; and subsequently the facts bearing on the other general question will be stated, and when the subsidiary inquiries are later on, dealt with, the facts pertaining to them will be mentioned, if not incidentally alluded to earlier.

Three bills in equity were filed in the Circuit Court of Baltimore City by the appellant, the Safe Deposit and Trust Company of Baltimore City, against the several appellees. To each bill demurrers were interposed; the demurrers were sustained and the bills were dismissed upon the *sole* ground that a Court of equity was without jurisdiction to grant the relief prayed. It appears from the face of the bills and exhibits that in the year eighteen hundred and ninety-five a certain Wesley A. Tucker departed this life leaving a last will and testament in and by which his widow, Rebecca J. Tucker, and his son, William Trump Tucker, were appointed executrix and executor, and were named and constituted trustees of the property therein disposed of on the trusts and conditions therein mentioned and set forth: That the executrix and executor after administering on the estate of the decedent, conveyed and transferred that portion thereof falling within and covered by the trusts created by the will, to themselves as trustees:

That the Circuit Court upon appropriate proceedings taken, assumed jurisdiction over the administration of the trusts named and described in the will and over the trust property and estate subject thereto: That a portion of the trust estate was invested in three hundred and twenty-eight shares of the capital stock of the Merchants and Miners Transportation Company, and in two hundred and eleven shares of the capital stock of the Northern Central Railway Company; and that

the certificates representing all of those shares stood in the names of Rebecca J. Tucker and William Trump Tucker, trustees of Wesley A. Tucker, deceased: That by certain orders passed at different times by the Circuit Court in the trust estate proceedings, the trustees were authorized to sell the above-named shares of stock with a view to the re-investment of the proceeds in other securities: That as to one hundred shares of the Merchants and Miners Transportation Company's stock the sale was directed by the Court to be made at the Public Stock Board of Baltimore, and as to the entire two hundred and eleven shares of the Northern Central Railway Company's stock, the sales were directed by the Court's orders to be made at the highest market price obtainable on the Public Stock Board of Baltimore City; and as to one hundred of the remaining two hundred and twenty-eight shares of the Merchants and Miners Transportation Company's stock the order instructed the trustees to sell at the highest market price obtainable at the Public Stock Board of Baltimore, "or otherwise, provided the same shall not be sold at less than one hundred and seventy ($170) dollars per share;" and as to the remaining one hundred and twenty-eight shares of the same stock the Court's order permitted the sale to be made at the "market price upon the Public Stock Board of Baltimore City, or at private sale at not less than $175.00 per share:" That all of the above-mentioned certificates thus plainly earmarked and distinctly identified as forming parts of the *corpus* of the trust estate of Wesley A. Tucker, deceased, and clearly showing that they did not belong to Rebecca J. Tucker or William Trump Tucker individually, were sold by the appellees—who are bankers and stock brokers—under circumstances, some of which need not be mentioned just here because having no relation to the branch of the case now being considered, but which will be stated later on when the liability of the several firms separately proceeded against comes to be discussed: That the appellees sold all the shares for the individual benefit and account of William Trump Tucker, and credited the proceeds of the sales to the individual account of

William Trump Tucker and paid the proceeds by check to him individually, without indicating in any way on the face of the checks that they represented the proceeds of the sale of stock belonging to a trust estate, and without naming Rebecca J. Tucker as trustee or payee, and without describing William Trump Tucker; the person named as payee therein, as trustee, although the appellee firms knew full well, both from information gathered from previous dealings with William Trump Tucker, and from the fact that the certificates all showed on their face that they represented stock standing on the books of the two corporations above-mentioned, in the names of Rebecca J. Tucker and William Trump Tucker, trustees of Wesley A. Tucker, deceased, that said stock, in fact belonged to and formed part of the trust estate of the decedent: That William Trump Tucker took the proceeds of said sales, thus paid to him individually, and converted them to his own private use without accounting to his co-trustee or to the trust estate therefor; that after wasting and despoiling the trust estate to a large amount he departed to, and is now residing in, some place unknown, and that he is utterly insolvent: That both Rebecca J. Tucker and William Trump Tucker were subsequently removed from the trusteeship and that the Safe Deposit and Trust Company was duly appointed in their stead. The three bills contained in the record were filed by the Safe Deposit and Trust Company, the substituted trustee. In the first, certain individuals who formerly traded as Frank B. Cahn & Company, and later in conjunction with a special partner as Roberts, Cahn & Company, were proceeded against to recover from them the sum of about seventeen thousand dollars representing the proceeds of the sale of one hundred shares of the capital stock of the Merchants and Miners Transportation Company ; in the second, certain individuals constituting the same firm of Roberts, Cahn & Company, were proceeded against to recover from them the sum of forty-two thousand, one hundred and thirty-eight dollars and thirty-nine cents, being the amount of the proceeds of the sale of the remaining two hundred and twenty-eight shares of

the Merchants and Miners Transportation Company's stock ; and in the third, certain individuals constituting a still later firm of Roberts, Cahn & Company were proceeded against to recover from them something more than twenty thousand dollars, being the amount of the proceeds of the sales of the two hundred and eleven shares of the capital stock of the Northern Central Railway Company. The liability of all the appellees is based upon their participation in Tucker's breach of trust. Upon the facts admitted by the demurrers, the first question presented is this: Has a Court of equity jurisdiction to decree that the defendants—the appellees here—shall restore to the trust estate the amounts which by their participation in Tucker's malversations they enabled him to abstract therefrom and to convert to his own use? Or, must the substituted trustee proceed by an action at law against these participants in Tucker's conceded breach of trust to recover the amounts lost by his defalcations ?

It cannot be doubted at this day, that on the facts alleged in the bills of complaint the appellees are answerable, in some forum—either in a Court of equity or in a Court of law— for their participation in the defaulting trustee's breach of trust. It is a general principle that all persons who knowingly take part or aid in committing a breach of trust are responsible for the money thus withdrawn from the trust estate, and they may be compelled to replace the fund which they have been instrumental in diverting. Every violation by a trustee of a duty which equity lays upon him, whether willful and fraudulent or done through negligence or arising through mere oversight or forgetfulness, is a breach of trust. There is in such instances no primary or secondary liability as respects the parties guilty of, or participting in, the breach of trust; because all are equally amenable. That a breach of trust was committed by William Trump Tucker does not admit of a doubt. He and his co-trustee were removed because he was a defaulter. He received the proceeds of the sales of all of the shares of stock which have been hereinbefore mentioned, and those proceeds formed part of the *corpus* of the

trust estate which it was his imperative duty to preserve intact. Instead of performing that duty he spent the funds or appropriated them to his own use. Whoever knowingly aided him, or knowingly participated with him, in misapplying those funds, became by reason of so aiding and so participating, equally liable with him to make the fund good by restoring the proceeds of the sales or an equivalent in cash to the trust estate. If the appellees aided and participated in Tucker's breach of trust in the manner and to the extent alleged in the pleadings as hereinbefore stated, then they are, beyond dispute, as responsible and answerable to the substituted trustee as is the defaulting trustee himself.

But in what tribunal must that responsibility of the appellees be enforced? The appellant says in a Court of equity; the appellees assert, in a Court of law because an adequate remedy exists there. If this were a proceeding against the defaulting trustee alone, can it be questioned that a Court of equity would have ample jurisdiction to require the spoliator to make good to the trust estate the funds belonging thereto which he had unlawfully converted to his own use? A Court of equity which has assumed charge of the administration of a trust estate has jurisdiction over the trust property and over the trustee; and if the trustee misappropriates the trust funds, squanders and misapplies them whilst a Court of equity has supervision over them and him, that Court would be lame and impotent indeed if it were powerless to compel, by its own process, the delinquent trustee to restore the abstracted funds, and if it were, in consequence of its own want of jurisdiction, driven to seek the aid of a Court of law to accomplish that result. "The trustee's personal liability to make compensation for the loss occasioned by a breach of trust is a simple contract equitable debt. It may be enforced by a suit in equity against the trustee himself, or against his estate after his death, and the Statute of Limitations will not be admitted as a defense, unless the statutory language is express and mandatory upon the Court." 2 Pom. Eq., sec. 1080. If the jurisdiction of a Court of equity is broad enough to enable

that Court to decree that a defaulting trustee shall make com-
pensation to the extent which he has wrongfully depleted a
trust estate; upon what principle can it be maintained that the
same jurisdiction will not extend to and bring within its scope
the individuals who may knowingly aid and assist the trustee
in his spoliation of the fund?   If the one is answerable in a
Court of equity, why should not the other be also ?   Both the
defaulting trustee and his confederates—those who aided and
abetted him—occupy precisely the same relation to the trust es-
tate. Each is primarily liable. Why, then, cannot the same tribu-
nal be invoked to enforce against both an identical liability?  The
participants in the defalcation—the persons who aid, and by
their conduct knowingly assist the trustee to squander the trust
funds—are chargeable with the loss, because, as stated by SIR
JOHN LEACH, Master of the Rolls, "in the consideration of a
Court of equity, they, by being parties to a breach of trust,
have themselves become trustees for the purposes of the tes-
tator's will."   *Wilson* v. *Moore*, 1 Myl. & Keene, 126.   By
their own wrongful act they have, in the consideration of a
Court of equity, constituted themselves trustees of the fund
they have aided the trustee in misapplying, and they may be
treated as trustees of the misapplied fund for the purposes of
the testator's will.   As the original trustee is answerable in a
Court of equity to the trust estate for his diversion of its funds,
because that Court has jurisdiction over the estate and over
him; it must of necessity follow, that those who aid the trustee
in his misappropriations of the funds and who by so aiding
him become themselves trustees of the diverted assets, are also
liable in a Court of equity, because by becoming trustees *ex
delicto* they have brought themselves within the jurisdiction to
which the testamentary trustee is amenable.   The forms and
varieties of the trusts which are termed *ex maleficio* or *ex de-
licto* are practically without limit.   "The principle is applied
wherever it is necessary for the obtaining of complete justice,
although the law may also give the remedy of damages
against the wrong-doer."   2 *Pom. Eq.*, sec. 1053.

The jurisdiction of a Court of equity to grant the relief

prayed for in these proceedings has been distinctly and une-
quivocally upheld by this Court. The substituted trustee
clearly became in equity the assignee of any rights of action
possessed by the *cestuis que trustent* for injuries done to the
trust property before the substituted trustee's appointment,
and it was clothed by the order appointing it with all the
powers conferred by the will of Wesley A. Tucker upon the
original trustees. This Court had before it a precisely similar
situation in *Stewart & Duffy, Trustees,* v. *Firem. Ins. Co.,* 53
Md. 564. It appeared in that case that a testator bequeathed
the residuum of his estate to two trustees upon certain trusts
which need not be stated here. The Circuit Court of Balti-
more City assumed jurisdiction over the administration of the
trusts, and thereafter the trustees with the consent and per-
mission of the Firemen's Insurance Company, transferred a
portion of that company's stock which belonged to the trust
estate, and appropriated the proceeds to their own use. Sub-
sequently the trustees were removed and Messrs. Stewart and
Duffy were appointed trustees in their stead. The decree,
which effected this removal and appointment, clothed the new
trustees "with all the power and authority conferred upon or
vested in" the removed trustees. The substituted trustees
then filed a bill in equity against the insurance company to
recover the stock thus lost to the trust estate, or its value;
and the insurance company specially denied the right of the
complainants to institute the suit, and also denied that the Cir-
cuit Court had any jurisdiction to confer such a right. It was
held in a carefully considered judgment delivered by the late
JUDGE MILLER, that a Court of equity has jurisdiction to en-
force the liability incurred by a participant in a breach of trust
by a trustee, and it was said: "In case of a trust like the one
before us we cannot doubt the power of a Court of equity, at
the instance of the *cestuis que trust* to supervise the trustees in
its management, to remove them for misconduct and appoint
others in their place, clothed with all the power and authority
over the trust estate which the original trustees had under the
instrument creating the trust. Why, then, is it not compe-

tent for the complainants to maintain this bill to recover the portion of the trust property which they aver has been lost through the misconduct of their predecessors and the negligence of the defendant corporation? It is true the question has never been expressly decided in this State, but in *Thurston.* v. *Blackiston,* 36 Md. 501, a similar bill was sustained without any such objection being interposed." After citing with approval the case of *Loring* v. *Salisbury,* 125 Mass. 148, this Court proceeded to say: "But apart from authority, and assuming the question is one of first impression, we have no difficulty in sustaining the right of the trustees appointed, as in the present case, to maintain suits against the proper parties for breaches of trust committed by, or injuries done to the trust property while in the hands and under the management of their predecessors." The insurance company was accordingly held responsible in equity at the suit of the substituted trustees for the loss sustained by the trust estate as the result of a breach of trust committed by the former trustees with the aid and co-operation of the company. Precisely the same relief was granted upon analogous facts in *Swift* v. *Williams & Moore, Trustees,* 68 Md. 236. In *Duckett* v. *Bank of Baltimore,* 88 Md. 8, the jurisdiction of a Court of equity to compel a participant in a breach of trust to make compensation at the suit of a substituted trustee was distinctly challenged and was in express terms upheld. In *Duckett* v. *Mechanics Bank,* 86 Md. 400, the jurisdiction was not questioned or doubted. The allusion in the last-named case to *Third Nat. Bk.* v. *Lange,* 51 Md. 138; *Marbury* v. *Ehlen,* 72 Md. 206, and *Stewart* v. *Fire Ins. Co.,* 53 Md. 564, was to distinguish them from the situation presented by the check which was payable to Scott, cashier, for deposit to the credit of Clagett *personally,* as the context plainly shows.

It has been vigorously and ingeniously contended in behalf of the appellees that none of the cases above cited is applicable here, because the proceedings now before us are in reality suits in equity for the recovery of damages and should have therefore, been instituted in a Court of law. The fundamental

proposition upon which the contention is based is, that the substituted trustee is the holder of a *legal* title, that as such holder it is not seeking to have the stock itself restored, because the shares were rightfully sold under an order of Court, and it is not endeavoring to have restored the proceeds of the stock in their identity as trust funds, because those proceeds, according to the averments of the bills, are no longer in the hands of the appellees, having been paid over to William Trump Tucker; but as the holder of the legal title the substituted trustee is attempting to recover from the appellees *damages* for the *negligence* of which they were guilty in the *method* of payment pursued by them, whereby they made it possible for William Trump Tucker to appropriate the proceeds to his own use. There are several fallacies lurking in this contention. It does not follow because the substituted trustee holds a *legal* title to the trust estate, that therefore the trustee cannot, in the circumstances of these cases, invoke the remedial aid of a Court of equity to compel a deposed trustee or his confederates to reimburse the depleted trust estate. Conceding that the trustee does hold the legal title, yet "the primary right, estate, or interest to be maintained, or the violation of which furnishes the cause of action," (1 *Pom. Eq.* sec. 130.) is essentially *equitable.* "In all cases of equitable *estates*  *  *  * they are in equity what legal estates are in law; the ownership of the equitable estate is regarded by equity as the real ownership, and the legal estate is  *  *  * no more than the shadow, always following the equitable estate, which is the substance, except where there is a purchaser for value and without notice who has acquired the legal estate." 1 *Pom. Eq.,* sec. 147. But equity jurisdiction embraces not only cases for the maintenance or protection of primary rights, estates and interests purely equitable, "but cases for the maintenance and protection of primary rights, estates and interests purely legal; and in the latter class of cases the remedies granted may be of a kind which are peculiar to equity Courts  *  *  * or may be of a kind which are administered by Courts of law, as the *recovery* of money, or of the possession of specific things."

1 *Pom. Eq.*, sec. 136.   Hence it is obvious that the mere cir-
cumstances that the trustee is clothed with a legal title and
seeks to recover money due to the trust estate are not suf-
ficient to indicate that equity has no jurisdiction to grant re-
lief.   Again; the implied assumption that there is no fiduciary
relation between the substituted trustee and the appellees is
equally fallacious.   It directly conflicts with the doctrine laid
down by the Master of the Rolls in *Wilson* v. *Moore, supra,*
pursuant to which the abettor of a defaulting trustee becomes
by participating in a breach of trust, a trustee for the purposes
of the testator's will and therefore amenable to the jurisdiction
of a Court of equity.

The case of *White* v. *White*, 1 Md. Ch. Dec. 53, has been
strongly pressed upon us as flatly deciding that a Court of
equity is without jurisdiction in such cases as these.   In that
case the bill of complaint averred that 46 shares of the stock
of the Manhattan Company of New York were transferred to
the defendant, Joseph White, in trust for the complainants,
and that Joseph White, by letter of attorney, empowered
Campbell P. White to sell and transfer the shares to the de-
fendant, John C. White, which was accordingly done; that said
defendant, John C. White, knew the stock was trust property,
but made no returns of the proceeds to the complainant,
though payment was duly demanded.   The bill then prayed
that John C. White account for the sale of the stock and pay
over the proceeds thereof.   The defendants relied by way of
defence (1) upon a want of jurisdiction in a Court of equity
over the case made by the bill, and (2) on limitations.   The
Chancellor decided that he had no jurisdiction in the premises
and he observed: "The bill presents the case of a *single* trans-
action of the sale of stock, the particulars of which seem to
have been known to the complainants; or of which the proof
was entirely within their reach, without having recourse to the
conscience of the defendant.   As between him and them there
was unquestionably no such trust as would bring the case
within the exclusive jurisdiction of a Court of equity."   This
*dictum* of the Chancellor has never been followed in Mary-

land, and though the case of *White* v. *White*, *supra*, has been referred to in three later cases, viz: *Abbott* v. *Balto.*, *&c.*, *Packet Co.*, 4 Md. Ch. Dec. 313; *Nelson* v. *Bank*, *&c.*, 27 Md. 75, and *Mason* v. *Union Mills Co.*, 81 Md. 452, it never has been followed or even alluded to on the question of jurisdiction. As it is flatly at variance with all the later decisions of this Court on this subject it must be regarded as overruled in this particular. We hold for. the reasons we have given, that the demurrers, raising the question of jurisdiction should have been overruled.

There is one other suggestion to be made before leaving this branch of the case. The bills of complaint were all dis-missed as we have already observed on the *sole* ground that a Court of equity had no jurisdiction over the cases stated therein. The *Act of 1896, ch. 229*, now *sec. 44, Art. 26*, and *sec. 113, Art. 75* of the Code of 1904 provides that in every case at law or in equity in which it shall appear that the plaintiff is entitled to some relief or to some remedy, but not in the particular Court in which the relief is prayed "the plaintiff shall not on that account be non-suited or the case dismissed;" but the case may, in the discretion of the Judge be removed to the proper Court. Whilst a failure to remove the case from one Court to another is not a ground for appeal, being a matter within the discretion of the Judge in the Court below, *Sum-merson* v. *Schilling*, 94 Md. 607, yet the statute shows it is the declared policy of the law that where it is apparent the plain-tiff is entitled to some remedy, the mere fact that he has in-voked the aid of the wrong tribunal shall not be a sufficient cause for the dismissal of his bill of complaint.

We come next to the second general question which relates to all three of the cases. The facts which need to be stated in considering this question are as follows: Prior to the month of August, 1902, Frank B. Cahn, Henry L. Straus and Henry Landon Davies composed the firm of Frank B. Cahn & Com-pany, which carried on a general banking and stock brokerage business in the city of Baltimore. That firm sold on August the eleventh, 1902, the one hundred shares of the capital stock

of the Merchants and Miners Transportation Company mentioned in the first of the three bills of complaint, and carried the proceeds to the individual credit of William Trump Tucker, as has been stated in an earlier part of this judgment. On September the ninth, 1902, the firm was dissolved by mutual consent and on the same day a new firm, known as Roberts, Cahn & Company was formed wherein William C. Roberts, Frank B. Cahn and Henry F. Straus were named as general partners, and Bernard Cahn as a special partner who had contributed one hundred and fifty thousand dollars as capital to the common stock of the concern. This latter was a limited partnership. Two days later an amended certificate, bringing in Henry Landon Davies as a general partner, was filed. These certificates were framed under *Art. 73 of the Code*, relating to Limited Partnerships. In the bill of complaint in the first case it is alleged that the firm of Roberts, Cahn & Company took over all the assets and assumed all the liabilities of the firm of Frank B. Cahn & Company. As the liability incurred by Frank B. Cahn & Company in August, 1902, by their participation in Tucker's breach of trust was an outstanding liability at the time Roberts, Cahn & Company took over the former's assets and assumed all of its liabilities, the contention is that Roberts, Cahn & Company are accountable to the substituted trustees and answerable for that liability. Whether the members of these two firms, both of which have been dissolved can be held liable for the same claim is the subordinate inquiry confined to the first case. It will be considered later on. The two sales of stock which are described in the second bill of complaint, were made by the firm of Roberts, Cahn & Company, of which Bernard Cahn was a special partner; and the firm was dissolved thereafter by mutual consent on February 10th, 1903, and thereupon the special partner received from the general partners, in either cash or securities, the amount of the capital contributed by him, and now has the same in his possession. On February the second, 1903, a new firm composed of William C. Roberts, Frank B. Cahn & Henry Landon Davies general partners, and Bernard Cahn,

special partner, was formed under the name and style of Roberts, Cahn & Company. To the common capital of this firm Bernard Cahn contributed one hundred and fifty thousand dollars in cash. On May the nineteenth, 1903, this firm sold the two hundred and eleven shares of Northern Central Railway stock *to themselves* notwithstanding the order of the Circuit Court directed the shares to be sold at the highest market price obtainable on the Public Stock Board of Baltimore City, and the proceeds were disposed of in the manner hereinbefore mentioned. On January the eighteenth, 1904, the firm was dissolved by mutual consent and Bernard Cahn received from Roberts, Cahn & Company in either cash or securities, the amount of the capital contributed by him as special partner and now has the same in his possession. Bernard Cahn demurred to the three bills, and one ground assigned was, that being a special partner he cannot be made liable *in personam*. The questions which these facts raise are (1) Is Bernard Cahn liable to be treated as a general partner? (2) Can he, if he was a special partner, be joined as a co-defendant with general partners? And the subordinate inquiry which arises under the first bill as previously indicated, is: Can the firm of Frank B. Cahn & Company, and the firm of Roberts, Cahn & Company be sued jointly on account of the transaction concerning the one hundred shares of stock named in the first bill of complaint? And the subordinate inquiry which arises under the third bill of complaint grows out of the circumstance that the firm of Roberts, Cahn & Company themselves purchased the shares of Northern Central Railway stock.

It is insisted that Bernard Cahn is not a special partner because (1) the business of a stock broker is not within the terms of the statute permitting limited partnerships to be formed ; and because (2) the firm is alleged in the bill to have had its general or principal office in the city of New York. Under *sec. 1, Art 73 of the Code, 1904*, limited partnerships may be formed for the transaction of any mercantile, mechanical, manufacturing or banking business within this State. The certificates of limited partnership executed by the appellees

all declared that "the general nature of the business intended to be transacted is a general banking, commission and brokerage business in stocks, bonds and other securities." Sec. 1 of Art. 73 expressly declares that the provisions of that article shall not be construed to authorize any such partnership for the purpose of making insurance. The certificates in so far as they refer to the business of banking bring the partnership within the express words of the Code; and the prohibition against construing the other terms employed in the section so as to include under them the business of making insurance, plainly indicates that those terms are to have a liberal and not a narrow meaning ascribed to them. Upon that principle the Court of Queen's Bench in *Bowers* v. *Holland,* 14 U. C. Q. B. 322, held that the buying and building of steamboats and employing them to carry on the business of transportation of passengers and freight was a *mercantile* business within the meaning of the limited partnership statute. Sales and purchases of bonds, stocks and other securities are equally mercantile transactions; and hence the objects for which the limited partnerships now before us, were formed, are, in our judgment, such as the Code has designated and allowed.

Next, as to whether the special partner is to be treated as a general partner merely because the bills aver that the firms did not have their "general or principal office" in the city of Baltimore. *Sec. 4 of Art. 73* requires the certificate, when acknowledged, to be recorded in the office of the Clerk of the Superior Court, if the principal *place of business* of the partnership be in that city. We cannot put upon that section a construction which would convert a limited partnership into a general one merely because the principal *office* of the concern is alleged to be out of the State, though its duly executed certificate declares, that its principal place of *business,* within the State of Maryland, is located in Baltimore City.

This brings us to the question respecting the right of the substituted trustee to join the special partner as a co-defendant in these proceedings. Limited partnerships were wholly un-

known to the common law and as they exist in the United States they are entirely statutory. "No such thing as a limited partnership can exist unless authorized by statute." 19 *Am. & Eng. Ency. Law* (2d ed.), 337. Limited partnership statutes must be construed with reference to the common law, and except as otherwise provided by the statute, the rights and liabilities of the partners and their creditors are governed by the rules of the common law applicable to ordinary partnerships. *Ib.,* 341. The fundamental difference between the liability of the general and the special partners is to be found in the fact that the former are responsible *in solido* for the debts and obligations of the firm, as in the case of ordinary partnerships, without regard to the amounts contributed by them to the social capital; whilst the latter is not personally liable. if the statute has been complied with, because his cash contribution is substituted for a personal liability. In the language of *sec. 2, Art. 73 of the Code,* the special partner "shall not be liable for the debts of the partnership beyond the fund so contributed by him   *   *   *   to the capital." Obviously, then, when all the requirements of the statute have been complied with no personal liability attaches to the special partner, but the cash contribution made by him does become liable for the debts of the partnership. The object of the provision which declares that the special partner's contribution to the capital shall be made "in actual cash," is, "to provide a fund on the day the company is formed, to be thereafter subject to no contingencies or losses, except those which come from the proper business of the partnership." *Lineweaver* v. *Slagle,* 64 Md. 483. Whilst, therefore, the limited partnership is a going concern, in which the cash contributed by the special partner stands for and takes the place of a personal liability on his part; it is entirely appropriate that *sec. 19 of Art. 73* should enact that "all suits respecting the business of the partnership shall be brought by and against the general partners only," except in cases mentioned in the section. And even after a dissolution whilst the cash contribution still forms part of the social assets, it is

also proper that the liabilities due by the firm should be enforced by suits against only the general partners ; because in both instances there is no individual liability attaching to the special partner, since his cash contribution itself measures the limit of his responsibility.    Looking to the object which the Legislature had in view when it required the special partner to contribute his proportion of the capital *in actual cash*, and bearing in mind the principle that except as otherwise provided by the statute, the rights and liabilities of the partners and the creditors are governed by the rules of the common law applicable to ordinary partnerships, the provision of *sec. 19* requiring all suits respecting the business of the partnership to be brought against the general partners only, must be construed to apply to suits brought whilst the firm is a going concern, and to suits brought after its dissolution but whilst the special partner's cash contribution still forms part of the assets, or has been wholly absorbed in the liquidation of debts due by the firm.    His cash contribution to the capital must make good or be answerable for, precisely the same debts and obligations for which, to the extent of that contribution, but no farther, he would have been personally responsible except for the restriction of that responsibility and the imposition of it on the cash contribution, by the Limited Partnership Statute. If this were not so the simple process of dissolving the firm by mutual agreement in anticipation of the date fixed in its certificate and the repayment to the special partner of his contributed cash capital, would relieve him and his cash capital from any liability for debts due by the firm at the time of its accelerated dissolution, though the cash capital was designed by the statute to be answerable for those debts and was intended to be "subject to no contingencies or losses, except those which come from the proper business of the partnership."    The withdrawal of the cash capital by the special partner and his consequent release from all responsibility, in such circumstances, whilst there are outstanding debts due by the firm, is not a contingency contemplated by, or provided for, in the statute ; and if permitted would subvert the whole intent of the legislation on this subject.

Upon turning to the record it will be found, as already stated, that the first sale of the trust estate stock was made by the firm of Frank B. Cahn & Company on August the eleventh, 1902; that on September the tenth following the limited partnership was formed which took over the assets and assumed the liabilities of the former concern. Then on November the second, 1902, and on January 6th, 1903, the limited partnership made the next sales. If the limited partnership is liable at all, it was liable to the trust estate on account of its participation in diverting from that estate the proceeds of the two last-named sales, when the diversions actually occurred, that is not later than January the sixth, 1903, and for its assumption of the prior firm's liability on account of the first sale. Now, on the tenth day of February, 1903, the limited partnership was dissolved by mutual consent though it had been formed to continue until December 31st, 1904, and upon its dissolution, the cash capital paid in by Bernard Cahn was returned to him in full, notwithstanding the above-mentioned liabilities to the trust estate were then outstanding and still are unpaid. The second limited partnership was formed February second, 1903. On May nineteenth, 1903, the transaction in regard to the Northern Central Railway stock took place. The liability of the second limited partnership then accrued. On January the eighteenth, 1904, that firm was dissolved by mutual consent though it had been formed to continue until February, 1905, and upon its dissolution, the cash capital paid in by Bernard Cahn was returned to him in full, notwithstanding the liability growing out of the railway stock sale was then outstanding and still is unpaid. Here then we have the admitted fact that liabilities existed against the two limited partnerships; that each of those partnerships was dissolved before the times fixed in their certificates and *after* the liabilities had been incurred, and the further fact that the special partner has withdrawn his *entire* contributed capital, though under the Code that capital stood in the place of, and as a substitute for, his personal liability; and yet it is insisted that only the general partners can be sued and that the special partner

who has in his pocket the fund which the law declares shall be responsible, can not be sued at all; whereby he will escape a personal liability altogether and will, in addition, retain his returned cash capital unimpaired. A Court of equity can scarcely be expected to place upon Art. 73 of the Code a construction which will in such circumstances as we have in this record, work out a result so wholly at variance with the spirit and design of the statute. *Sec. 13 of Art. 73* declares that "no part of the sum which any special partner shall have contributed to the capital stock shall be. withdrawn by him * * * during the continuance of the partnership." What becomes of the security which this provision was intended to afford, if, before the expiration of the period during which the partnership was formed to continue, the firm can be dissolved by mutual consent, and if the special partner can then with immunity withdraw his capital? A succession of dissolutions and withdrawals of capital would be quite a simple and effective expedient to shield the special partner from any liability whatever, if the theory of the appellees were sanctioned. But *sec. 20 of Art. 73* expressly makes provision for a suit against both general and special partners, and thereby indicates that *sec. 19* ought to be so limited in its application as to include and refer to only such suits as are instituted during the existence of the co-partnership or during the time, after its dissolution, that the special partner's cash capital still forms part of the firm's assets in the hands of the general partners. Sec. 20 enacts "if in any case a suit shall be brought against general and special partners and at the trial of the cause it shall appear that the special partners or any of them are not liable to the suit of the plaintiff the Court may proceed to judgment or decree against the partners who may appear to be liable, in the same manner as if such partners were the only parties defendants to the writ, excepting that the partners who may be deemed not liable shall recover their legal costs against the plaintiff and such additional costs as the Court may deem reasonable." The situation disclosed by the record does not bring *Art. 73* into force, and as to the withdrawn cash capital the

rules of the common law must prevail. We hold, then upon this branch of the case that the demurrer filed by Bernard Cahn, and which is founded on the assumption that because he was a special partner he cannot be in any event sued conjointly with the general partners, should have been overruled in view of the facts alleged in the bills of complaint.

We now come to the subordinate inquiries and but a few words will be needed to dispose of them.

It is objected that the two firms should not have been sued jointly in the first case, because (1) the liability incurred by Frank B. Cahn & Company in the transaction connected with the first sale of the trust estate stock is not such a liability as the second firm assumed; and because (2) both firms cannot be held. The liability of the first firm was a liability to restore a certain sum of money to the trust estate—it was an obligation which it owed—and we can see no reason why it should not be included in the liabilities assumed by the second firm, inasmuch as the latter assumed *all* the liabilities of the former. But apart from this both firms have been dissolved, and the bill in the first case was filed against the individual members of the two firms, and as all the members of the firm of Frank B. Cahn & Company were also members of the firm of Roberts, Cahn & Company, they are responsible to the substituted trustee whether as members of the first or the second firm. The exact nature of their liability will in the end, depend on the evidence.

Finally: It will be remembered that the appellees purchased the railway company's stock themselves at private sale in spite of the Court's order that the shares should be sold "at the highest market price obtainable on the Public Stock Board of Baltimore City." In addition to the reasons hereinbefore given in support of the liability of the appellees, the fact that they themselves bought the shares at private sale with a full knowledge that they were shares belonging to the trust estate impresses upon the shares in their hands the same trusts which the shares were subject in the hands of the trustee (*Abell* v. *Brown*, 55 Md. 221; *Wormley* v. *Wormley*, 8 Wheat. 419), in

view of the fact that the appellees aided and assisted the defaulting trustee to deplete the trust estate.

Upon a review of the whole case we are of the opinion that there was an error committed in sustaining the demurrers and in dismissing the bills.    The decree of the Circuit Court will, therefore, be reversed and the causes will be remanded.

> *Decree reversed with costs above and*
> *below and causes remanded.*