Bessie S. Mudge et al., Appellants, v. Mitchell Hutchins
and Company, Inc. et al., Appellees.

Gen. No. 38,549.

Heard in the second division
of this court for the first district at the December term, 1935.
Opinion filed April 6, 1944.

RICHARD A. BIERDEMANN, of Chicago, and GILLESPIE,
BURKE & GILLESPIE, of Springfield, for appellants.

GARDNER, CARTON & DOUGLAS, of Chicago, for appellees; HENRY A. GARDNER, ERWIN W. ROEMER and WILLIAM L. FAY, all of Chicago, of counsel.

MR. PRESIDING JUSTICE FRIEND delivered the opinion of the court.

On September 25, 1931 plaintiffs Bessie S. Mudge, Anna Mudge and Hugh U. Mudge, filed a bill in equity against Mitchell Hutchins and Company, Inc., and the individual defendants who by succession continued the stock brokerage and investment business of the corporation as copartners doing business as Mitchell Hutchins and Company, seeking an accounting for the alleged conversion of certain shares of the capital stock of the New York Trust Company which belonged to the estate of their mother, of which they were beneficiaries. After issue was joined, the cause was submitted to the chancellor upon a lengthy stipulation of facts, and a decree was entered dismissing the bill of complaint for want of equity, from which plaintiffs have taken an appeal.

The case was docketed in the Appellate Court for the December term 1935. Thereafter by stipulation of the parties, appellants were granted numerous extensions of time for filing their abstracts and briefs over a period of more than seven years, pending the outcome of certain other litigation in the Federal courts, and in June 1943 after all briefs had been filed, the cause was ordered placed on the oral argument calendar and argued on March 14, 1944.

From the salient stipulated facts it appears that under a trust agreement dated March 4, 1920 Arwilda M. Mudge, the mother of plaintiffs, conveyed to her son, Burton M. Mudge, as trustee, certain securities in trust which included two stock certificates aggregating 68 shares of the capital stock of the' Liberty National Bank of New York. Pursuant to a merger, that stock was later exchanged for 68 shares of stock of the New

York Trust Company. It is for the alleged conversion of these shares that this suit was filed.

The trust agreement of March 4, 1920 (hereinafter referred to as the first trust) provided that the income should be divided into four equal parts, one of which was to be paid to Mrs. Mudge, the settlor, and the remaining three parts, one each to her sons, Charles, George and Hugh; that upon the death of Mrs. Mudge, the trust was to terminate and the assets were to be turned over to the executor named in her will. She reserved the right to revoke the agreement during her lifetime, and if not terminated or revoked it was to be automatically terminated upon her death. Shortly after her death on March 30, 1927, her son Charles died in Cook county, Illinois, on July 24, 1927, leaving him surviving as his sole heirs the plaintiff Bessie Mudge, his widow, and John Henry Mudge, his minor son. By his will Bessie Mudge was named executrix thereunder, as well as the sole legatee. The estate has been administered and the executrix discharged. Upon oral argument the recent death of Bessie S. Mudge was suggested, and an order was entered that Harriet Long, as executrix, and John Henry Long, her sole heirs at law, should be substituted as parties appellant in lieu of Bessie S. Mudge, deceased. In October 1929 George Paul Mudge, another son of Arwilda Mudge, died in the State of Missouri, leaving him surviving his widow Anna Mudge, one of the plaintiffs herein, and two minor children, Wallace and Arwilda Mudge. His will was admitted to probate in Jackson county, Missouri, and it appearing that the assets of the estate did not exceed the amount to which the widow was entitled by law, the executor was discharged. Shortly thereafter in March 1930 Wallace, the minor son of George Paul, died, leaving his mother and his sister as the only heirs at law.

On October 22, 1921 Mrs. Mudge entered into a second trust agreement with her son Burton Mudge.

That agreement made no mention of the first trust, but all the securities deposited under the first agreement, including the 68 shares of the Liberty National Bank stock, were deposited under the second trust. The terms of holding, investment and distribution in the second trust agreement were identical with those contained in the first, but in the second agreement a different successor trustee was named.

It was in March 1921, just prior to the execution of the second trust agreement, that the Liberty National Bank merged with the New York Trust Company, and in due time a certificate for 68 shares of the new stock of the New York Trust Company was issued in the name of ''Burton Mudge as Trustee under trust agreement between Arwilda M. Mudge and Burton Mudge, dated March 4, 1920,'' but this certificate was not received by Burton Mudge until some time in November 1921, and in the meantime the second trust agreement of October 22, 1921 had been executed. Upon the receipt of the certificate in November 1921, Burton Mudge, the trustee, did not have it changed into his name as trustee under the second trust agreement, but retained it in his name as trustee under the first trust.

Mrs. Mudge died March 30, 1927, and by her will Burton Mudge was named as executor without bond. She left her surviving her four sons. Her will was admitted to probate in Cook county, Illinois, and Burton Mudge, after qualifying as executor thereof, filed his inventory in the probate court, listing therein all the property which came into his possession as trustee, including the 68 shares of the capital stock of the New York Trust Company. After the death of Charles Mudge, his widow Bessie Mudge raised the question whether Mrs. Mudge had set up a trust under her will or whether the assets of the estate passed under the residuary clause. Burton Mudge as executor thereupon filed a bill in the superior court on November 3, 1928, asking for a construction of the will, and some

two years later an agreement was reached between the parties and a decree entered by the court finding that when Mrs. Mudge died, Burton Mudge did not have in his possession or control any part of her estate which had been delivered to him as trustee under the agreement of March 4, 1920, and that Burton Mudge, Hugh Mudge, Bessie Mudge as sole legatee under the last will of her husband Charles, and Anna Mudge as residuary legatee under the last will of George Paul Mudge, were each the owner of one-fourth part of the estate under the residuary clause contained in the will.

It appears from the stipulated facts that after the execution of the first trust Burton Mudge, desiring under the broad powers vested in him as trustee "to hold, manage, control, sell, transfer, deliver, pledge, mortgage and encumber any part or all of the property comprising the trust, and to invest and reinvest the moneys of the trust and to sell, collect, alter or change the investments of the trust," sold securities held by him as trustee and invested and reinvested the proceeds in other property consisting of shares of stock, bonds and other securities; and it was evidently part of the plan of administration of the trust estate that securities be held in the individual name of the trustee, because from the stipulated facts it appears that "said Burton Mudge from time to time, in order to more conveniently handle the properties that he held as trustee, in making sales as authorized and investing and reinvesting the funds of said estate in accordance with said powers, caused to be transferred to his own name personally securities held by him as trustee," and that "among the last of the securities to be transferred to Burton Mudge individually, in accordance with this plan of operating the trust estate, was the certificate for sixty-eight (68) shares of stock of the New York Trust Company." Defendants' counsel argue that the settlor of the trusts and the testatrix from whom plaintiffs derive their claim, must have ac-

quiesced in the action of her trusted son Burton Mudge in holding trust securities in his individual name, because from the very establishment of the trust some of the securities were so held, and at the time of the execution of the second trust agreement some of the trust securities were held in Burton Mudge's name individually and no change whatever was made in the possession of such certificates or securities or in the names appearing in those documents as the owners thereof. Whether Mrs. Mudge, the settlor, and the testatrix from whom plaintiffs derive their claim, acquiesced in the action of Burton Mudge in holding trust securities in his individual name, as defendants contend, is not disclosed of record, but it is a fair assumption that she did in view of the broad powers vested in the trustee, the stipulated facts with respect to the plan of administration of the trust estate, and the circumstance that at the time of the execution of the second trust some of the trust securities were held in Burton Mudge's name individually and no change whatever was made in the possession of such certificates or securities or in the names appearing on those documents as the owners thereof.

In November 1927 after his mother's death, Burton Mudge as trustee indorsed the stock certificate in question to himself individually and delivered it to the defendants with the request that they guarantee his signature and send it to the New York Trust Company, for transfer by that corporation. Defendants stamped the indorsement ''Signature guaranteed,'' and forwarded the certificate to Kidder Peabody and Company, their New York correspondents, for delivery to the New York Trust Company. Kidder Peabody and Company also indorsed the certificate ''Signature guaranteed,'' and delivered it to the New York Trust Company for transfer on its books. The defendants were not at that time members of the New York stock exchange, and their guarantee of Mudge's signature

was not a warranty of his authority or capacity under the rules of that exchange. Therefore upon receiving the certificate, the New York Trust Company refused to transfer it on the signature of Mudge, as guaranteed, and demanded proof of Mudge's power to transfer the stock. Nothing occurred thereafter for substantially a year and until the fall of 1928, when Burton Mudge, Jr., who happened to be in New York on other business, consulted the officers of the New York Trust Company at his father's request, and was told it would be necessary to produce a certified copy of the trust indenture of March 4, 1920, under which the stock was registered as being held. Not until March 1929 did Burton Mudge procure a copy of the trust indenture certified to by his attorneys, or take any steps toward securing a transfer of the bank stock. On March 21, 1929 he delivered to defendants the certified copy of the trust indenture, together with a letter bearing the same date, asking that the same be forwarded to the New York Trust Company in order that the stock might be transferred, saying that he wanted the transfer made in order "to simplify the handling of these shares when it is desired to sell them or part of them. In their present form it is difficult to readily sell or transfer them. Under the terms of the Trust Agreement, no one is required to see to the application of the proceeds and I have the right to invest and reinvest the proceeds of sale of securities." Mudge's action at that time appears to have been prompted by the fact that in March 1929 the capital stock of the New York Trust Company was changed from $100 to $25 par value, and warrants were issued to stockholders giving them the right to purchase additional shares. This is borne out by the fact that he inclosed with his letter warrants for 54 and 2/5 shares and requested defendants to purchase three-fifths additional rights, so that he could purchase 55 new shares. Defendants thereupon forwarded the copy of the trust indenture to

Kidder Peabody and inclosed Mudge's letter of explanation without comment. The old certificate for 68 shares was then in New York. Subsequently on April 5, 1929 after the New York Trust Company had received the certified copy of the trust indenture and the old certificate from Kidder Peabody and Company, together with a subscription for additional shares, on advice of its counsel, who had reviewed the powers of the trustee, it transferred the old certificate and issued to Burton Mudge individually four certificates for 75 shares each and one for 27 shares of the new stock. A week later defendants delivered the four 75-share certificates to Burton Mudge, and at his request sold for his account the 27 shares, the proceeds from which were deposited in a bank account carried in the name of Burton Mudge, trustee. During the months of June and July following, Burton Mudge removed the four stock certificates from the safety deposit box which he carried under the name of Burton Mudge, trustee, and pledged them with the Boulevard Bridge Bank of Chicago to secure the indebtedness of corporations owned and controlled by him. Plaintiffs learned of the withdrawal and use of the New York Trust Company stock by Mudge for his own purpose about the middle of March 1930, but it was not until early in August 1931 that any demand was made upon defendants in accordance with the claims set forth in this proceeding. That was the first notice which defendants had of Burton Mudge's breach of trust. Prior to that time they had never been informed of the fact that the original trust of 1920 had been superseded by one executed in 1921, or of the death of Mrs. Mudge, and no circumstances had come to their attention which in any way indicated that Burton Mudge was misusing trust properties for his personal benefit. Throughout the matters connected with the transfer of the stock by the New York Trust Company, defendants had acted without any profit to themselves.

As applicable to the foregoing facts, plaintiffs take the position that when defendants assisted the trustee in having the certificate transferred to himself individually by guaranteeing his signature on the assignment thereof and forwarding the certificate to New York for transfer, with notice that the stock of the New York Trust Company had been issued in the name of the trustee and the warning and legal implications arising from that fact, they participated in the transfer, conversion and breach of the trust and became just as liable as the person who actually made the transfer and as the trustee who converted the money, regardless of the fact that their motives were honest and that they received no benefits from the transaction. The question presented is one of first impression in this State, and in the absence of any decisions on the precise question, plaintiffs are forced to rely largely on so-called bank cases where trust funds were deposited and credited to the individual account of the trustee and used by him for his own purposes under circumstances indicating that the bank, with full knowledge of the breach of trust, facilitated the conversion of trust funds by the trustee, and thereby became a participator in the conversion. They say that "the case at bar is to be decided under the Illinois law, not the English law, and the two Illinois cases cited [*Massachusetts Bonding Co. v. Standard Bank,* 334 Ill. 494; *State Bank and Trust Co. v. Commercial Trust and Savings Bank,* 300 Ill. App. 435] are ample authority, particularly where defendants cite none."

In the *Massachusetts Bonding Co.* case, one Joyner was appointed receiver of the Midland Casualty Company by the circuit court of Cook county. As such receiver he opened an account with the Standard Bank and from time to time deposited therein receivership funds. He ultimately defaulted in his accounts in the approximate sum of $33,000 and absconded. In com-

pliance with an order of the court, Massachusetts Bonding Company, as surety, paid the amount of his defalcations, and by decree of that court was subrogated to the rights of the Chicago Title and Trust Company, which had been appointed receiver as Joyner's successor. The theory of the bill to establish the liability of the bank was that Joyner drew checks against his account in favor of the bank in payment of his personal obligations to it and for his own personal use, which the bank paid with knowledge of the facts. The evidence adduced upon the hearing clearly indicated that the bank actually paid out trust funds with notice that they were being misappropriated; it accepted payments on Joyner's personal indebtedness to it out of the receiver's funds, growing out of stock transactions with a local brokerage firm on his own account, with the knowledge of one Miles, a bank official, who was Joyner's nephew, and certainly knew that the receiver was misappropriating trust funds. Under these circumstances, the court held that the bank not only aided Joyner in his defalcations and participated therein with full knowledge that he was committing breaches of trust, but actually benefited thereby.

A similar conclusion was reached in the recent case of *State Bank & Trust Co. v. Commercial Trust & Savings Bank,* 300 Ill. App. 435, wherein the bank permitted the Evanston town collector, one Rogers, who was also an officer of the bank, to transfer town funds to his individual account and then allowed him to exhaust the account for his personal use. In a divided opinion the court approved the well-established principle that when a bank *knowingly* permits the misappropriation of trust funds deposited by a public official, it becomes equally liable with the derelict trustee, but Mr. Justice O'CONNOR, dissenting, pointed out what he considered the harshness of the conclusion reached by the majority, and distinguished the *Massachusetts Bonding Co.* case on the ground that there was the

greatest irregularity on the part of the officers of the bank as well as the receiver.

Notwithstanding their apparent willingness to rest their case on the foregoing Illinois decisions, plaintiffs also cite and rely on several cases in other States. In *Duckett v. National Mechanics' Bank,* 86 Md. 400, 38 Atl. 983, the bank was held liable for the misappropriation of the proceeds of one check because it violated specific instructions on the face of the check to deposit funds "to the credit of Henry W. Clagett, trustee." In reaching its conclusion the court said that "This liability of the bank depends, however, altogether upon the contingency that it knowingly aided the trustee, Clagett, to commit the default of which he was undeniably guilty. If without knowledge of Clagett's misconduct, or if without sufficient notice to put it on inquiry that would have enabled it to ascertain that Clagett was mingling with his individual deposits and using as his own, money that the bank knew or had the means of knowing was trust money; or if it was merely the innocent agency through which, without fault or negligence on its part, Claggett depleted the trust estate, then it was not guilty of aiding him in misappropriating the trust fund and is not liable to restore it." In a later Maryland decision, *All v. McComas,* 162 Md. 690, 161 Atl. 187, demurrers were sustained to bills seeking to hold purchasers of trust property liable for participation in a breach of trust because they made out checks to an executor in his individual name without characterizing him as executor or trustee. Plaintiff in that proceeding relied upon the *Duckett* case and upon *Safe Deposit & Trust Co. v. Cahn,* 102 Md. 530, 62 Atl. 819, also cited by plaintiffs herein, contending that defendants had facilitated a misappropriation of trust funds by the executor. The court held that the demurrers were properly sustained because there was no allegation that defendants had any knowledge of the contemplated misuse of the

funds, and concluded that ''With no charge of bad faith on the part of the appellees [defendants] and none that they were on notice of the intended misuse of funds by the executor and trustee with whom they dealt, and no failure of duty by them, we think the action of the chancellor in sustaining the demurrers in these cases was proper.''

In *Jennie Clarkson Home v. Missouri, K. & T. Ry. Co.*, 182 N. Y. 47, another of plaintiffs' citations, a broker, one Gibson, who was held liable, advised the wrongdoer, Lessels, how to obtain the information to secure a transfer of registered bonds he had stolen and actually assisted in the preparation of a fraudulent power of attorney. Gibson was a member of the stock exchange and acting under its rules guaranteed the authority of Lessels, as treasurer of the plaintiff, to transfer the bonds, then forwarded the papers, together with a purported corporate resolution which, on its face, showed irregularity, to the railroad company, which made the bonds payable to bearer, and also sold the bonds and handed the proceeds over to Lessels, thus clearly converting the plaintiff's securities.

The mere guarantee of the trustee's signature by defendants in the case at bar was certainly in no way comparable to the conduct of the banks and individuals who were charged with liability in the foregoing cases. To be sure, defendants had notice that the stock had been given in trust, but they had no knowledge of the trustee's intention to misappropriate trust funds. In the so-called bank cases, notice that there is a trust is given a bank when a depositor presents a check payable to himself ''as trustee'' and asks that it be placed to his individual credit or account; nevertheless, if a bank complies with the request and places trust funds in the trustee's personal account, it incurs no liability from that fact alone, and unless it has notice that the trustee is improperly using the funds for his own purposes the bank is not liable. In all the cases called to

our attention, liability was predicated on other circumstances, known to the bank, indicating that the trustee was committing a breach of trust; and the rule of liability (which requires that other circumstances, known to the bank, must exist) is clearly set forth in the Restatement of the Law of Trusts, sec. 324, comment d, as follows: "Although the bank knows that the funds deposited are trust funds, and the deposit is made in the name of the trustee personally, the bank is not bound to make inquiry whether the trustee is committing a breach of trust in making the deposit; and although the deposit is made in breach of trust, the bank in receiving the deposit is not liable for participation in the breach of trust, in the absence of further circumstances known to the bank indicating that the trustee is committing a breach of trust." In his exhaustive work on Trusts and Trustees, sec. 908, Professor Bogert summarizes the results of the bank decisions, and supports by citation of authority what appears to be the general rule in most jurisdictions, including Illinois, as follows: "It frequently happens that paper which runs to 'T, as trustee,' is offered by the trustee for credit to his personal bank account. Assuming that the form of the paper puts the bank on notice that the paper is trust property, is the bank put on inquiry as to the power of the trustee to deposit it in his personal account? Is the bank a participator in a breach of trust if it credits the private account as directed, and thereby the trustee is enabled to apply the trust funds to his own benefit?

"If one can imagine a case where the bank has actual notice that the object of the credit to the private account was to facilitate the stealing of the trust funds by the trustee, it would obviously be a participator in a breach if it permitted the trust paper to be credited to the private account. Or if the bank is instructed to place trust paper to the trust account, and in violation of instructions credits it to the private account of the

trustee, the bank may well be liable to the cestuis. [Citing the *Duckett* case.]

"But if there is no actual notice of impending breach to be accomplished by such a transaction, and no notice of suspicious circumstances, outside the form of the paper and deposit slip, which makes it dishonest not to inquire, it is generally held that the bank which permits cash or paper known to be trust property, or labeled with a trust label, to be credited to the personal account of the trustee, is not put upon inquiry and is not a participator in a breach by that act alone.

"While, as shown previously, it is bad practice for a trustee to carry trust credit in his personal bank account, and, if the bank fails, the trustee will be a guarantor of the safety of funds so held, it is not deemed by the courts a breach of trust or such a suspicious circumstance as to put a duty on the bank to investigate. The courts feel that the bank is entitled to believe that the trustee will check the trust credit out of the personal account for trust purposes, and that he is merely guilty of careless or unbusinesslike methods of handling the trust·property and not of dishonest practices. It is the judicial opinion also that to require the bank to investigate such a transaction would put a burden on the bank for which it is not paid by the trust, and would clog the handling of commercial paper in a way which would be a disadvantage to the business community."

Plaintiffs say that their "entire case is built upon the theory that defendants' guaranty of the trustee's signature on the stock certificate with knowledge that he intended to have a new certificate issued in his individual name, was not only instrumental in bringing about the transfer, but was entirely responsible therefor, because without such guaranty stock certificates can not be transferred," and they carry the argument further by asserting that "not only did the defendants guarantee the trustee's signature, but they forwarded

to New York a certified copy of the trust agreement which had *terminated by the death of Mrs. Mudge,* and by so doing, led the New York Trust Company to believe that the trust agreement was still in existence and the settlor still alive. Certainly when the New York Trust Company called for a certified copy of the trust agreement, they were not calling for a trust agreement that was no longer in existence, but were calling for the document that would show the authority vested in the trustee. Thus, the defendants' acts which were so instrumental in bringing about the transfer were the guarantee of the trustee's signature and the forwarding of the trust agreement to the New York Trust Company.'' As heretofore indicated, the stipulated facts clearly show that prior to August 1931, when demand was made upon them in accordance with the claims set forth in this proceeding, defendants had never been informed of the fact that the original trust of 1920 had been superseded by one executed in 1921, or of the death of Mrs. Mudge. Moreover, the trust agreement forwarded by defendants to the New York Trust Company was furnished by the trustee's attorneys, and from all that appears of record they were justified in assuming that it was the only instrument in existence and that Mrs. Mudge was still living. We find no authority for the contention that it was incumbent on them to conduct an independent investigation. When the guaranteed certificate and the trust agreement ultimately reached the New York Trust Company, it made an inspection of the document and on the advice of counsel effected the transfer upon its own responsibility. With that decision defendants had nothing to do. In forwarding the indenture defendants merely acted as a conduit. They did not, as plaintiffs contend, say, in effect, to the New York Trust Company that they could be sure the trust was still in force, or anything to like effect; their guarantee, given in 1927, was simply that the trustee's signature was genuine, and

the guarantee was based upon their knowledge of his indorsement and not upon the certified copy of the trust indenture which no one saw until March 1929. As we view it, the ultimate question presented is whether the conduct of defendants, admittedly in good faith, amounts to such participation in a breach of trust as to render them liable to plaintiffs. We think they were not liable because their acts were not the effective cause of any loss to plaintiffs and did not constitute a conversion of plaintiffs' property. It is a salutary rule to hold a trustee sharply accountable for his wrongful conduct. It is quite another thing to make third persons who deal with trustees in good faith liable for losses which they in no way cause.

Subsequent to the transactions here involved, the Illinois legislature adopted the Uniform Fiduciaries Act in July 1931. Section 9 of that act (Ill. Rev. Stat. 1943, ch. 98, par. 242 [Jones Ill. Stats. Ann. 135.14]) provides: "Deposit in fiduciary's personal account.] If a fiduciary makes a deposit in a bank to his personal credit of checks drawn by him upon an account in his own name as fiduciary, or of checks payable to him as fiduciary, or of checks drawn by him upon an account in the name of his principal if he is empowered to draw checks thereon, or of checks payable to his principal and indorsed by him, if he is empowered to indorse such checks, or if he otherwise makes a deposit of funds held by him as fiduciary, the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary; and the bank is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary without being liable to the principal, unless the bank receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in making such deposit or in drawing such check, or with knowledge of such facts

that its action in receiving the deposit or paying the check amounts to bad faith.'' Although that statute is not retroactive, it now represents the settled public policy of this State and establishes rules as to constructive notice of breaches of fiduciary obligations. Section 3 of the act which deals with stock transfers, was designed, in the words of the New York Law Revision Commission, ''to expedite the transfer of securities by fiduciaries with title, relieving trust estates from delay resulting from the rule imposing a stringent duty of investigation upon corporations registering transfers.'' (See *Stark v. National City Bank,* 278 N. Y. 388, at p. 401.)

Section 3 (par. 236) of the Uniform Law [Jones Ill. Stats. Ann. 135.08] reads: ''Registration of transfer of securities held by fiduciaries.] If a fiduciary in whose name are registered any shares of stock, bonds or other securities of any corporation, public or private, or company or other association, or of any trust, transfers the same, such corporation or company or other association, or any of the managers of the trust, or its or their transfer agent, is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in making the transfer, or to see to the performance of the fiduciary obligation, and is liable for registering such transfer only where registration of the transfer is made with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in making the transfer, or with knowledge of such facts that the action in registering the transfer amounts to bad faith.'' Obviously, if the transfer of stock in the case at bar had occurred in 1931, after the passage of the Illinois statute, instead of in 1929, the question of liability would not have arisen because it must be conceded that both the New York Trust Company and defendants acted in good faith and without any actual notice of any breach of trust on the part of the trustee; and although the

statute is not retroactive, it nevertheless furnishes guiding principles and an expression of policy for a decision of the controversy here presented. Moreover, under the common law of England, which is the basis of the law of Illinois, the rule was that a corporation whose shares were held by a trustee, was not bound to inquire as to the powers of the trustee to transfer the shares, and no liability attached to a corporation for registering a transfer from a trustee without inquiry, even though the transfer was, in fact, in breach of trust. *Hartga v. Bank of England,* 3 Ves. Jr. 55; *Bank of England v. Parsons,* 5 Ves. 665; *In re Perkins,* 24 Q. B. D. 613. Defendants call our attention to the fact that in *Stark v. National City Bank,* 278 N. Y. 388, the New York Court of Appeals adopted this precise line of reasoning and reversed an opinion of the Appellate division, which had held the bank liable for participating in the exchange of Bancitaly Corporation and Bank of Italy stock for shares of Transamerica Corporation by an administratrix in 1929. The shares were part of an estate but were unauthorized investments under the New York law. Although the Uniform Fiduciaries Act was not adopted in New York until eight years later and although, unlike the Illinois statute, the New York act expressly provided that it did not apply to transactions prior to its adoption, the court referred to the English authorities and to the reasons underlying the enactment, and after quoting section 3 of the act, said: "The statute, though not retroactive, is a legislative declaration of a public policy. We need not, however, resort to it in this case. Here there is not only absence of actual knowledge by the defendants that the fiduciary contemplated a wrong to the estate but also absence of notice or of constructive knowledge of any wrong. . . . In the absence of bad faith on their part they are not responsible for loss caused to the estate by misuse of the stock thereafter by the administratrix."

For the reasons stated, we have reached the conclusion that it would be inequitable to hold the defendants liable; the effect of such a decision would not only create difficulties and handicaps in the administration of trust estates but would go "to the very verge of justice in making good to *cestuis que trust* the consequences of the breaches of trust of their trustees at the expense of persons perfectly honest, but who have been, in some more or less degree, injudicious." (*Barnes v. Addy,* L. R. 9 Ch. App. 244, quoted with approval in Scott on Trusts, sec. 327, vol. III, p. 1777.) We think the chancellor properly dismissed the bill for want of equity, and the order is therefore affirmed.

*Order affirmed.*

SCANLAN and SULLIVAN, JJ., concur.