J. WILLIAM MIDDENDORF ᴇᴛ ᴀʟ. COMMITTEE *vs.* BALTIMORE REFRIGERATING AND HEATING COMPANY OF BALTIMORE CITY, A Cᴏʀ-PORATION ET ALS.

*Corporations: insolvent; receivers; ordered to continue business. Sales in equity; advertisement; exceptions; order for sale; duty of exceptant.*

It is the duty of one appealing from an order of a Court of Equity directing the sale of property, not only to show that the order is erroneous, but that he has been injured by it.
p. 23

Where the property and assets of an insolvent corporation can be sold better as a *going concern,* it is proper for the Court to order the receivers to continue the business.    p. 25

A sale of such property, subject to the outstanding contracts of the receivers, is proper; a prospective purchaser should ascertain from the trustees the number and character of such contracts.                                p. 25

Where a committee of the bondholders of an insolvent corporation, representing a large proportion of outstanding bonds, purchases the property at a resale at much less than was bid at the original sale, it is not to be asssumed that this was due to the form of the order (which made the sale subject to the contracts entered into by the receivers).    p. 22

An appeal from the order of a Court of Equity for the sale of the property, taken after the sale, does not stay proceedings, nor affect the rights of the purchaser, unless an appeal bond is given or a stay procured.    p. 25

The fact that the advertisement of a sale by a trustee under the order of a Court of Equity may not have been altogether clear does not make the order erroneous; if the advertisement was misleading or the terms uncertain, so as to deter possible purchasers, such questions should have been raised by exceptions to the ratification of the sale.    p. 27

*Decided December 6th, 1911.*

Appeal from the Circuit Court No. 2 of Baltimore City (STOCKBRIDGE, J.).

The cause was argued before BOYD, C. J., PEARCE, BURKE and URNER, JJ.

*George Whitelock* and *E. C. Carrington, Jr.,* (with whom was *Wm. Ewin Bonn* on the brief), for the appellants.

*Edward Duffy* and *Clarence K. Bowie,* for the appellees.

*George R. Willis* and *Clarence K. Bowie* filed a brief on behalf of Francis T. Homer *et al.,* committee.

*Lemmon & Clotworthy* and *Bond, Robinson & Duffy,* filed a brief on behalf of the Continental Trust Co. Trustee.

BOYD, C. J., delivered the opinion of the Court.

A bill was filed on November 3rd, 1910, by Messrs. Middendorf and Heyward, committee, and Robert M. Spedden against the Baltimore Refrigerating and Heating Company

of Baltimore City, the Continental Trust Company and others. The plaintiffs sued for themselves as well as for all other holders of the bonds of the Refrigerating and Heating Company who would come in and contribute to the expenses of the suit. That company under date of October 1st, 1902, executed to the Continental Trust Company, as trustee, a mortgage to secure an issue of two thousand bonds of the par value of $1,000 each. The mortgage embraced all of the company's property, including its good will, its franchises, rights and privileges. The bill alleges that 1300 of the bonds were issued, and of that number nineteen had been redeemed for the sinking fund, leaving outstanding 1281, of which four were in the hands of receivers of the company who had been appointed. The interest coupons for five semi-annual payments were overdue when the bill was filed. Two committees for bondholders had been appointed—the plaintiffs being spoken of as the Middendorf-Heyward committee and those of the defendants as the Homer-Betts committee. The receivers had been appointed in December, 1908, and on January 12, 1909, they were ordered to continue the business of the company until the further order of the Court. They were also made defendants in this case.

It is alleged in the bill that the three original receivers were by order of Court directed to purchase from Richard B. Fentress certain leasehold property known as the Negro School-house property, subject to an annual rent of $300.00, and that they paid one-third of the purchase money in cash and gave the vendor their obligations as receivers for the payment of the balance, taking from him a bond of conveyance, which obligated him to convey the property to the receivers on the payment of the balance of the purchase money. That was doubtless the reason for making him a defendant, as will be seen by reference to the prayers of the bill. On December 11th, 1909, some bondholders of the company filed a bill against the company and the Continental Trust Company alleging that the latter had cer-

tified and issued 600 bonds of the Refrigerating Company without taking proper steps to see to the application of the proceeds of the bonds, and claimed that the Trust Company was not a proper party to act as trustee. An answer was filed by the Trust Company in that case alleging that all the bonds were properly issued and that it had faithfully performed its duties. That controversy resulted in the Trust Company being restrainted until final hearing from taking any steps to foreclose the mortgage.

The bill in this case prayed (1) that an account be taken of all the bonds secured by the mortgage; (2) that the Court decree that the receivers had no title to the Negro School-house property, and that the equitable title was in the Refrigerating Company subject to the lien of the mortgage, and should be conveyed by the receivers to the company, and that Richard B. Fentress be directed to convey the legal title to the company on payment of the balance of the purchase money; (3) that the company be required to bring into Court a sum sufficient to pay the total amount of bonds outstanding, and in default thereof that it be barred and foreclosed from all equity of redemption, and (4) for general relief.

On November 12th, 1910, the plaintiff filed a petition for the sale of the property before final decree and on the 7th of December, 1910, an order was passed directing the sale and appointing the Continental Trust Company trustee to make it. It is recited in the decree that parties representing 1187 of the 1277 outstanding bonds were before the Court consenting to the sale. Solicitors for the plaintiffs, the Homer and Betts committee and for Mr. Fentress approved the form of the order passed.

On February 3rd, 1911, the trustee reported a sale of the property to the Central Securities Company for the sum of $503,000.00. There is nothing in the record to show just what proceedings were taken against the purchaser, but a letter from Messrs. Whitelock and Keech, addressed to JUDGE STOCKBRIDGE, states that the purchaser would not

insist upon an order *nisi.* if the Court would defer action
as to resale until March 27th, 1911, and in that event the
purchaser would offer no opposition to the passage of a final
order of resale at that time, if it had not in the meantime
complied with the terms of sale.    On March 27th, the Court
passed an order ordering a resale at the cost and risk of the
purchaser, and referred to a report of the Continental Trust
Company filed on March 15th (which is not in the record),
and to the fact that the sale had been ratified.    It was ordered
that the resale should take place at the Real Estate Exchange
on the 17th of April, 1911, "and shall be made upon the
same terms as the sale heretofore made, but subject to and
with the right to any and all contracts entered into by the
receivers."    A sale was reported on April 26th by the trustee
to Messrs. Homer, Beets, Schloss, Winchester and Timanus
"constituting a committee of bondholders of said Baltimore
Refrigerating Company," at and for the sum of $261,000.

On May 4th an appeal was entered by Richard B. Fen-
tress, one of the defendants in the above entitled cause, from
the order of this Court, in the above cause, made on
March 27th, 1911, directing a resale of the property of the
Baltimore Refrigerating and Heating Company, and from
the order of this Court in the above cause, made on April
17th, 1911, further directing a sale of said property of the
said Baltimore Refrigerating and Heating Company."

Motions to dismiss the appeal have been filed, which
mainly rely on the allegations that Mr. Fentress had no such
interest as entitled him to apppeal, and that he is not shown
to be prejudiced by the resale.    The objection urged to the
order of resale by the appellant is based on the provision that
it shall be made, *"subject to and with the right to any and
all contracts entered into by the receivers."*

The order of April 17th referred to in the appeal is not
in the record and, of course, can not be reviewed by us.    It
may well be questioned whether the order of March 27th
should be reviewed in the absence of the one of April 17th,

which is spoken of as "further directing a sale of said property." It is quite possible that there may be something in that order which would affect the part of the one of March 27th objected to, but, regardless of that, does the appellant show that he has been in any way injured by that order of March 27th? There is nothing in the record suggesting that anyone has been or could be injured except the fact that the property only brought a little over half at the second sale of what it did at the first. But the report shows that the second purchase was made by a committee of bondholders, and it is not unusual for such a committee to purchase property at a price less than its real value, for if others are not willing to bid a sum sufficient to pay the indebtedness, or at least such part of it as the bondholders are willing to accept, the representatives of the bondholders are likely to bid the property in with the hope that they can eventually get more for it at private sale. If they do, they are not apt to bid more than they have to, in order that the commissions may be kept as low as possible. As this committee represented 1028 out of the 1287 bonds outstanding, it by no means follows that their purchase at so much less than was bid at the first sale was the result of the form of the order. Indeed the presumption would rather be that the first purchaser concluded that it had made a bad bargain, as otherwise it is not likely it would have sacrificed the $25,000.00 which it paid in cash on the first sale.

One peculiarity about this case which is not explained is that the record shows that the appellant is one of the bondholders whom this committee represents, and surely those bondholders could not suffer by the fact that their representatives had purchased the property at a low figure. It would be difficult therefore for us to infer that passing the order in the form in which it was passed was not only error but injurious to the appellant. If he was a stockholder he certainly could not claim that he had any pecuniary interest as such, for the amount, at which the property

was sold at the first sale, would not have paid fifty per centum on the bonds outstanding.

It was suggested at the argument that the appellant was entitled to have the order reviewed as of the date of its passage, and should not be affected by subsequent events. But his appeal was not taken until after the report of the resale was filed, and, although the record does not contain all that ought to have been in it, it does include that report and we can not admit that we are not at liberty to consider it. If the resale had in point of fact resulted in bringing more than the property brought at the first sale, surely we would not have been required to reverse the order, even if we thought it was erroneous, merely because of the insertion in it of what is complained of. The only possible ground of complaint on the part of the appellant that could be entertained would be either that he had been or might be injured by the order, and if the record showed that he had not been, we know of no rule or practice which would permit, much less require us to ignore a fact disclosed by the record which affirmatively showed that he was not and could not be injured.

Indeed if that report was not in the record, and a sale had been made and reported, we might with propriety have declined to review the action of the Court in passing this order, because it would be useless to pass on it if in point of fact the sale had not resulted injuriously to him, and the burden is on him, not only to show error, but injury as the result of the error. The appeal was not taken until after the sale and we can not imagine that it would have been taken, if the appellant had not known the result of the sale.

But even if we ignore the report of the resale, was there any reversible error in the order? By section 209 of Article 16 of the Code, the Court has authority on application of the trustee appointed by the Court to sell real estate to compel the purchaser to comply with the terms of a resale, by process of attachment or other execution suited to the case,

"or the said Court, upon such application, may direct the property purchased to be resold, at the risk of such purchaser, *upon such terms as the Court may direct.*" That also applies to sales made under powers of sale in mortgages. *Aukam* v. *Zantzinger,* 94 Md. 427. The bill shows that the receivers were ordered to continue the business of the Refrigerating and Heating Company until the further order of the Court, and the proceedings, including the bill, the petition for the order of sale and the order itself show that the receivers were still conducting the business. The petition states, as the bill does in substance, that there was no fund available to the receivers with which to make needed additions and improvements, excepting only the earnings coming into their hands from the property, "they being, as already adjudicated, without legal power to raise money upon receivers' certificates and this Court having declared in its opinion heretofore filed in the cause of Peter E. Tome against the Baltimore Refrigerating and Heating Company that they are not entitled to expend the income in improvements and additions to said property." When then the Court passed the order of resale, it is only fair to assume that there were no contracts which had been entered into by the receivers for the expenditure of any such large sums of money as the appellant suggests the order might have included. In paragraph 9 of the bill it is stated, "The said business consists largely of the manufacture of ice for commercial purposes, the furnishing of cold storage for various products, and the supplying of heat to individuals and corporations by mains owned and operated by the company." It would scarcely be denied that property of the character in question could be sold to more advantage as "a going concern" than as a plant which was out of, and had no business. Everyone who has had any experience in such matters knows that to be so, and judges, who have dealings with such properties through their receivers, can not shut their eyes to such facts. It was essential to the successful conduct of the

business by the receivers for them to have authority to make contracts for furnishing ice, cold storage, etc., and, while the record as presented to us is to meagre to give us much information as to what was done, we can assume that the receivers had made such contracts for the season which was soon to open (the order being dated March 27th, 1911), and that they had some contracts for supplying heat, which would still be necessary at that time of the year.

Simple justice to the receivers and their customers would require that such contracts be preserved, and purchasers, if desirous of continuing the business of this going concern, would certainly have preferred to have such contracts kept in force.    There is nothing in the record which suggests, much less establishes that there was any kind of contracts in force, excepting those in connection with the conduct of the business authorized by the Court, and the order could not be construed to refer to those, if any, made by the receivers which they were not authorized to make.    Those contemplating becoming purchasers could easily have ascertained from the trustee the character and doubtless the number of contracts in existence, and the liability which would be assumed by taking the property subject to them.    But if there was any possible danger of the interests of the appellant or anyone else being injuriously affected, by that provision in the order, the fair and proper way would have been to call such danger to the attention of the Court before the sale, so it could be remedied.    Instead of pursuing that course, however, the appellant waited until a week or more after the sale—considerably more than a month after the order was passed—before doing anything, and he then took an appeal, which not only did not stay further proceedings, but which could not affect the rights of the purchaser in the property, even if this order was reversed, as he did not give an appeal bond or procure a stay.    *Wampler* v. *Wolfinger*. 13 Md. 337; *Lenderking* v. *Rosenthal,* 63 Md. 28; *Garritee* v. *Popplein,* 73 Md. 322; sec. 29 of Art. 5 of *Code.*

In the absence of something to show the contrary, the presumption is that the lower Court inserted this clause in the order for some good reason for so doing which had been brought to its attention, and we can not assume that the contracts referred to could not be definitely and accurately ascertained before the sale and made known to purchasers, even if we passed on the order without considering the report of resale and the advertisement which were in the record.

By looking at them, we can see that what we would have had the right to assume from the allegation in the bill and petition was in fact the case. The advertisement after describing the property at length said: "All of the aforesaid property, rights, franchises, licenses, privileges and interests subject to and with the right to any and all contracts entered into by the receivers of the Baltimore Refrigerating and Heating Company of Baltimore City will be sold as a whole, the same now constituting a going concern and being operated by said receivers," and in the report it is stated, "the auctioneer thereof also announcing at the time of said offer that the contracts mentioned in the advertisements as entered into by the receivers are for ice and cold storage of merchandise at season rates, and are such as are regularly made in this business and are beneficial to the property as a going concern." If that be so, and there is nothing in the record to question it, it is easy to see how unjust it would be to reverse this order on the ground that it was broad enough to include contracts for improvements, repairs, etc., which might have prevented persons from bidding on the property, when in point of fact the contracts referred to were such as a purchaser intending to run the plant would in all probability want and which could have easily been ascertained. If it was not so, the Court would doubtless have given relief to a purchaser who had become so by reason of that representation.

So without deeming it necessary to pass on the motions to dismiss the appeal and without determining whether the appellant had such interest as entitled him to appeal, we will affirm the order. If it be conceded that the trustee ought to have stated in the advertisement the kind of contracts there were, that would not make the order erroneous, for if the advertisement misled intending purchasers, or kept some from bidding by reason of the alleged uncertainties as to what contracts they would render themselves liable for, and the property for that reason did not realize as much as it would have otherwise done, all such questions could have been considered and passed upon under exceptions to the sale, but as the case is presented to us by this record we must affirm the order.

*Order affirmed, the appellant to pay the costs.*