JOHNSON & HIGGINS, INC., *v.* MARY A. BRAUN SIMPSON, ADMINISTRATRIX.

[No. 47, October Term, 1932.]

576

*Decided January 11th, 1933.*

The cause was argued before Bond, C. J., Urner, Adkins, Offutt, Digges, Parke, and Sloan, JJ.

*Charles Markell* and *George Ross Veazey,* for the appellant.

*Harry O. Levin,* with whom was *H. Lee Brill* on the brief, for the appellee.

Offutt, J., delivered the opinion of the Court.

On October 8th, 1924, John M. Braun was employed by Johnson & Higgins, Inc., a Maryland corporation, to act as its president and manage its insurance business in Baltimore,

Maryland. The contract of employment, which was in writing, provided that Braun should devote all his time, energy, and skill to developing the business of the corporation; that he should serve it "faithfully and diligently"; that he should observe instructions given him by the authorized officers of the principal stockholders or the directors of his employer, and should "do nothing whatever in his public or private conduct to prejudice the interests of the party of the first part"; that he should conduct the business as far as legally possible in the name of his employer; that all bank accounts should be kept in its name; that Braun would "maintain and keep a full and complete accounting record of all business transacted by him, whether in the name of the party of the first part or in his own name, open at all times to the inspection and examination of the principal stockholders of the party of the first part or their duly authorized representative, and to make such periodical written reports to the principal stockholders of the business tranacted as may be requested by them"; that he would, at the termination of the contract, turn over to the employer the office and all records, accounting and otherwise, maintained by him in the conduct of the business, "whether in the name of the party of the first part or his own name"; and that he would not, without the employer's consent, engage in any business outside the scope of the agreement. It also provided on the part of the employer that it would pay Braun a salary at the rate of $4,680 per annum as full compensation for his services, and "in the event of the death of the party of the second part whilst in the service of the party of the first part undertakes to pay and will pay to the executors and administrators of the estate of the party of the second part a full year's salary, at the rate being paid to him at the time of his death, less a sum equivalent to the total of payments made said party of the second part during the period of incapacity, if any, preceding his death." It further provided that, should Braun "become incapacitated for the performance of his duty for a period of more than six months," the employer might cancel the contract, but that in

that event it would pay him a full year's salary at the rate "being paid him" at the beginning of such incapacity, and that either party might terminate the agreement upon thirty days' notice.

Braun entered the service of Johnson & Higgins, Inc., under that agreement, and remained in its employment until he was killed in an automobile accident in the City of Washington on December 1st, 1930. He left to survive him an infant daughter, and letters of administration *ad colligendum* on his estate were issued to Mary A. Braun Simpson, from whom he had been divorced and who had since remarried, the mother of that daughter. She thereupon demanded of his employer $5,200, being one year's salary at the rate paid him at his death, and, upon its refusal to pay that sum, she brought this action.

The declaration contains the six common counts and a special count on the contract. In that count the pleader alleged the appointment of the plaintiff as administratrix, the execution of the contract, the death of Braun while employed by the defendant, the rate of his compensation at that time, that his death occurred without prior incapacity, and that the defendant had refused her demand that it pay to her under the contract $5,200. The declaration was supported by affidavit, and a copy of the contract was filed with it. To that declaration the defendant filed four pleas, those numbered one and two being the usual forms of the general issue, and plea number four, while not technically a plea of set off, was apparently intended to serve the purposes of such a plea. Its third plea was in this form: "And for a third plea the defendant says that by the provisions of the agreement of October 8th, 1924, attached to the declaration in this case, the decedent, John M. Braun, undertook, as part of his contract of employment by this defendant, Johnson and Higgins (Maryland), Inc., 'to serve it faithfully and diligently,' but that said John M. Braun failed to serve the defendant faithfully and diligently, but upon the contrary, during the period of his employment, embezzled a considerable sum of money from his employer, and that by reason of said dishonesty,

discovered shortly after the death of the said John M. Braun, this defendant elects to treat said contract as rescinded and denies any obligation to the plaintiff for the payment of a full year's salary at the rate of pay in force at the time of said John M. Braun's death, as claimed by the plaintiff in the declaration filed herein." The usual affidavit and certificate of counsel were filed with the pleas. The plaintiff joined issue on the first and second pleas, demurred to the third, demanded the particulars of the fourth, and, when the particulars were furnished, filed by way of replication what would amount to general issue pleas in an action of assumpsit, and a third replication that the plaintiff "has not, and never had assets sufficient to pay the alleged claim of defendant." The demurrer to the third plea was sustained, and the case went to trial on those pleadings, except that the declaration was amended to show that Mrs. Simpson had been appointed administratrix of the estate of John M. Braun, instead of administratrix *ad colligendum*.

The trial resulted in a verdict for the plaintiff, which, upon a motion for a new trial, was set aside. Following that the defendant filed a motion to have the case removed to the Circuit Court of Baltimore City, and, when that motion was refused, it filed by way of rejoinder to the plaintiff's third replication to its fourth plea what is described as a "plea on equitable grounds." A demurrer to that rejoinder was also sustained, the case again went to trial, and again a verdict for the plaintiff was returned. It is from the judgment on that verdict that this appeal has been taken.

In the course of the trial the defendant, the appellant here, reserved fourteen exceptions, thirteen to the court's rulings on evidence and one to its action on the prayers. Those rulings on the pleadings, the evidence, and the prayers are submitted by the record to this court for review, and will be considered in their order.

There was no demurrer to the seventh count of the declaration, but the appellant contends, and properly, that the plaintiff's demurrer to its third plea mounted up to the first error

in pleading, and that, therefore, the sufficiency of the seventh count of the declaration may be considered by this court. The specific objection to the count is that it fails to directly allege performance, and unless there is something in its language from which performance may be inferred, or, unless the contract imposed an obligation upon appellant to pay the appellee $5,200 whether Braun performed what the contract required him to do or not, the objection is good. For it appears to be a general rule that one who sues for the breach of a contract which requires him to perform certain acts before he becomes entitled to demand that for which he sues, must allege and prove performance on his part. 1 *Chitty, Pleading* (5th Amer. Ed.), *281; 1 *Poe, Pl. & Pr.*, sec. 565; 13 *C. J.* 725.

The only allegation in the count from which an inference of performance may be drawn is that, when Braun died, he was in appellant's employ and that at that time the contract was in full force and effect. The contract fixed no definite term for its operation but ran until terminated by death, dissolution, or the act of the parties. If therefore it was in full force and effect at the death of Braun, he had been in the employ of the appellant under it since 1924, and it could be inferred from that fact that he had performed his promises to appellant's satisfaction. And, while such averments fall short of the certainty required by good pleading, and for that reason the count was insufficient in law, the error will not be treated as reversible, first, because, instead of calling the attention of the trial court to the defect at a time when it could have been readily corrected, appellant elected to withhold any direct objection to it until the parties had been subjected to the expense of a trial, and the case had reached this court, and, second, because it was not injured by the ruling. In view of that conclusion, the alternative proposition, that appellee is entitled to recover in this case whether Braun performed his contract or not, will not be discussed at this time.

The second point to be considered in connection with the

rulings of the trial court on the pleadings is whether its refusal to remove the case to a court of equity may be reviewed in this court. That it may not be so reviewed needs no further argument than a reference to the statute itself (Code, art. 75, sec. 124), and the two cases which deal with that question. *Summerson v. Schilling,* 94 Md. 607, 51 A. 612; *Safe Deposit Co. v. Cahn,* 102 Md. 542, 62 A. 819.

The third question raised by the pleadings is whether the defendant's rejoinder to the plaintiff's third replication to its fourth plea is bad in law, but as the point was not argued in this court the objection will be treated as abandoned.

The demurrer to the defendant's third plea was properly sustained since all its allegations of material fact were provable under the general issue pleas.

The significance of the exceptions to the rulings of the trial court on questions of evidence and on the prayers will become more readily apparent by some preliminary reference to the contentions of the respective parties to this appeal, as to the issues in the case.

It appears to be the theory of the plaintiff that the obligation imposed by the contract upon the defendant to pay Braun's personal representatives a full year's salary in the event that he died while in its service under the contract was collateral to and independent of so much of it as related to the discharge of his duties under it, and that to recover it was only necessary to prove the contract, to show that at the time of Braun's death it was in full force and effect, and that he died whilst in the service of the defendant. That is the theory submitted by the seventh count of the declaration, and that is the theory upon which the plaintiff's case was tried.

The defendant on the other hand contends that that promise on the part of the defendant was as much a part of the consideration moving from it to Braun as was his salary, and that to entitle him either to his salary or to the benefit of that promise, he was obliged to perform the promises he had made in the contract, and that, if he failed to show, or, if it appeared from the evidence, that he had not per-

formed what he had undertaken, he was not entitled to recover. And as a corollary of the proposition it contends (a) that there is in the case no evidence legally sufficient to show that he did perform what he promised, and (b) that the uncontradicted evidence shows that he did not perform what he promised, and that in either event the court should have directed a verdict for the defendant. The controlling question arising from those conflicting views is whether to entitle Braun's administratrix to enforce the defendant's promise to pay to his personal representative $5,200 in the event of his death while in its service, and while the contract was still in force, it must first appear that Braun had done those things which in the contract he had agreed to do. And since that question affects all the rulings which we are asked to review, it will be first considered.

Appellee's contention amounts to no more than this, that appellant's promise to pay Braun a year's salary, if during the life of the contract and while in its service, Braun (a) became incapacitated for the performance of his duty for a period of more than six months, or (b) died, ripened into an irrevocable, fixed and vested right as soon as Braun entered its employment under the contract, and that nothing that he did or failed to do after that could affect the right of his personal representatives to enforce the promise. Or, stated in another way, that appellant promised as an inducement to him to make the contract at all that it would insure him against death or disability while in its service, and that such undertaking was as independent of the contract as though, instead of insuring him itself, it had procured for him from a third person a policy of insurance covering those contingencies.

Such a construction, however, appears to be forced, unreasonable, and inconsistent with common knowledge of the motives and impulses which ordinarily influence the acts of men, and inconsistent as well with the purpose and terms of the contract itself. The most likely and probable reasons for the promise were (1) to induce Braun to remain in appellant's employment, for only so long as he did that would

he be protected by the promise, and (2) to add that protection as additional compensation for the efficient performance of his duties under the contract. The contract was revocable upon thirty days' notice by either party, and it was obviously intended for the benefit of both parties to it. It may be assumed that appellant would not have permitted it to continue, if to its knowledge Braun proved to be inefficient, faithless, or dishonest, but it cannot be supposed that it intended to pay Braun's personal representatives a year's salary in the event of his death in its service while the contract was in force, if it appeared after his death that Braun's default in the performance of his duties would have justified a rescission of the contract, when, because of his own fraud, knowledge of that default was concealed from the appellant during Braun's lifetime. In other words, it is improbable that the employer intended to perform those things which it promised for the benefit of the employee unless he did those things which he promised to do for the employer. The promises were mutual and concurrent, and those on the one part made in consideration of those on the other part, and it would go farther than anything in the language of the contract permits, to assume that the employer intended to bind itself to reward the employee, if, instead of promoting its interests by the honest and efficient performance of his duties, he damaged its business by faithless and fraudulent practices. The employer's promise as to salary, and its promise as to insurance, while independent of each other, were nevertheless integrated as component parts of the entire consideration moving from the employer, and each alike depended for value upon the promises of the employee. The very subject-matter of the contract indicates the same conclusion. The appellant was attempting to employ Braun to act as its president, and to operate and develop its insurance business, and whatever it promised him, it naturally promised as a consideration for that service. There was no other service contemplated by the contract, nor is it possible to discover any consideration for the employer's insurance promise except the promise of Braun to serve it faithfully

and diligently as its president and manager in the manner stipulated in the contract.

In the agreement Braun promised to serve the appellant "faithfully and diligently," and to "maintain and keep a full and complete accounting record of all business transacted by him, whether in the name of the party of the first part or on his own name," and by way of defense to the appellee's demand, appellant, to show a default in those promises, offered evidence intended to prove that Braun had embezzled appellant's funds and that to conceal such embezzlement he had falsified its accounting records, and the several exceptions presented by the record relate to rulings as to the admissibility and the effect of that evidence.

Worden L. Castle, president of the appellant corporation, called by the plaintiff, testified that Braun had been employed by it prior to December 1st, 1930, but that he himself was not at the Baltimore office of the company prior to January, 1931. He was then asked on cross-examination what knowledge he had of the "way" Braun had "carried out his contract of employment." An objection to the question was sustained, and that ruling, which is the subject of the first exception, was undoubtedly correct (1) because the question was not proper cross-examination, (2) because it called for hearsay, and (3) because it called for opinion instead of fact.

The second, seventh, eighth and thirteenth exceptions were abandoned. Castle was later called by the appellant and identified certain account and check stub books, and was then examined as to certain checks and bank deposit slips. On cross-examination he was taken over much the same ground, but on redirect he was shown a certain check and asked "where else in the book of the company" it would appear. He answered that it would be in the cash disbursements ledger and journal and go "through the usual procedure." Counsel for appellant then offered to show him the "books concerning this particular check," and asked him whether they did not refresh his recollection as to it. An objection to that question was sustained, and that ruling is

the subject of the third exception. The exception appears to be quite without point. The books to which it referred had neither been proved nor offered in evidence, the witness had no personal knowledge of the check, it did not appear that he had any memory of it to be refreshed, and, if he had, appellant had no right to refresh it in that way. For like reasons the ruling involved in the fourth exception is also free from error.

As stated above, the appellant was in the insurance business, and, in the course of it, issued policies in all classes of insurance except life. One of its customers was the Davison Chemical Company, and the appellant called John F. Donnelly, the auditor of that company, apparently to prove that checks which it gave to the appellant to cover certain premium charges incurred in 1930 had not been credited against those charges, but had been applied to an indebtedness incurred in 1929, and that checks covering those 1929 charges had been similarly diverted, so that, while the Davison Chemical Company in fact owed appellant nothing, its books showed that Davison Chemical Company owed the 1930 charges which it had paid. Donnelly testified to the 1930 charges, and to the fact that they had been paid by checks issued by the Davison Chemical Company. Appellant then attempted to prove by him the amounts charged against the Davison Chemical Company for premiums on insurance policies issued by the appellant prior to 1930 and that checks had been issued covering those charges. An objection to that offer was made, and appellant then asked the specific question, "Have you a check issued to Johnson & Higgins of September 5th, 1929; and if so for what amount?" An objection to that question was sustained, and appellant then offered to prove the entire account between the two corporations beginning in 1928. An objection to the offer was sustained, and that ruling is the subject of the fifth exception. The evidence was offered for the dual purpose of showing an indebtedness from Braun to the appellant, and of showing that Braun had fraudulently falsified appellant's records. Appellant did not undertake in its offer to show that Braun

had actually appropriated to his own use any of the payments made to him by the Davison Chemical Company, so that the evidence would not have been admissible under the set off, but it was admissible to show that the records of the company had been falsified, and for that reason there was error in excluding it. For Braun had agreed to keep "full and complete" records of the company's business, and the evidence would have tended to prove that as to that account at least he failed to perform that promise.

There was evidence tending to prove that a check for $2,850, which the Davison Chemical Company had issued in 1930 to cover premium charges for that year, had never been credited against such charges, but had been applied to charges incurred in 1929, which, although they had in fact been paid in 1929, appeared on the books to be unpaid. Dorothy E. Morton, bookkeeper for appellant since February, 1930, had testified that, when the check for $2,850 was received in 1930, instead of crediting it against charges for that amount incurred in 1930, she credited it against charges for a like amount incurred in 1929, because she did not know that the 1929 charges had been paid. She was then asked if the Davison Chemical Company paid anything additional after the 1930 check for $2,850. She said "No, Davison never paid it twice." That answer was stricken out over appellant's objection and that ruling is the subject of the sixth exception. The witness was in a position to know, she kept the company's books, and there was no apparent reason why she should not have been permitted to answer the question, but the error was not reversible, for in answer to a question by the court she repeated the answer without objection.

It having previously appeared that appellant's auditor was a certain Paul E. Besio, the same witness was asked on cross-examination whether there was anything to prevent him from finding out in March anything he wanted to know about the affairs of the company, and she answered "Nothing at all, except you are not allowed to go to customers and ask them. * * *" On appellee's motion the court struck out the

answer, and, in the absence of anything in the record to show that the witness had any direct knowledge, we cannot say that there was error in that ruling, which is the subject of the ninth exception.

Besio, after testifying that he had been auditing the accounts of the appellant since 1924, was asked why he did not take up the accuracy of their respective accounts with "the customers at each annual inspection." An objection to that question was sustained, and, while there is no apparent reason why it should not have been allowed, in the absence of any offer it cannot be said that the ruling, which is the subject of the tenth exception, injured appellant. In the interest of the orderly administration of justice, and to avoid useless expense to the state and to litigants in its courts, it has long been the settled policy of this court not to reverse for harmless error. And as a corollary of that policy, it has held that in all cases the burden is upon the appellant to show injury as well as error. *Middendorf v. Refrigerating Co.,* 117 Md. 23, 82 A. 1047. And, while the decisions in other jurisdictions are not uniformly in accord with that view (4 C. J. 910), it does find support in decisions in other states (*Prescott v. Williamson,* 108 Ark. 500, 158 S. W. 770; *Frick v. Kabaker,* 116 Iowa, 494, 90 N. W. 498; 4 C. J. 912, note 77; *Id.* 914, note 95), and is at least consistent with reason and common sense. The rulings involved in these exceptions illustrate the wisdom of that rule. If in fact it was the custom of appellant to check the accounts kept by its employees with its customers, and in Braun's case it was induced not to do that by him, or if no such inquiries were made because such a course would have been inconsistent with the business policy of the appellant, the inquiry would have been relevant as reflecting upon the question of waiver or condonation. But it may well be that no such custom existed, or it may have appeared that the witness did check the accounts with the customers of the appellant, and learned before his death many of the facts of which it now complains, but waived or condoned such dereliction as they indicated, in

which case the exclusion of the evidence would not have injured the appellant, and a reversal would mean a retrial of the case for a reason which could not have affected the verdict upon which this judgment rests. It was in the power of the appellant to have informed the court, at the time, of the scope and character of the evidence he wanted to introduce, but in the absence of such an offer it will be assumed that it was not injured by the rulings. For the same reason there was no reversible error in the rulings involved in the eleventh and twelfth exceptions.

At the conclusion of the case the plaintiff offered two prayers, and the defendant thirteen. All of those prayers were refused and the court drew and granted one prayer of its own, and an additional prayer "at the request of the plaintiff."

The defendant's A prayer was a general demurrer to the evidence, and its B, C, D, and E prayers asked for a directed verdict on the ground that the uncontradicted evidence showed that Braun had violated his contract. There was in the case evidence tending to show that, during Braun's administration of its affairs, all the account books and records of the appellant were open for inspection by Johnson & Higgins, Inc., a New Jersey corporation which owned the entire issue of the capital stock of Johnson & Higgins, Inc., a Maryland corporation, the appellant, except qualifying shares, and that throughout his administration the New Jersey corporation audited the books of the Maryland corporation annually. It further appeared that Braun continued in appellant's employment until his death. From those facts it may naturally have been inferred that what Braun did was accepted by the appellant as a satisfactory discharge of the promises which in the agreement he undertook to perform, because what he did was either a literal performance, or, if not that, appellant waived any irregularities. In other words that evidence was legally sufficient to establish a *prima facie* case for the appellee. By way of defense appellant undertook to show (1) that Braun embezzled appellant's funds, and (2) that he falsified

its records. It also pleaded by way of set-off that Braun was indebted to it in the sum of $4,845.86, amended to read $4,687.07, and it appears by comparison that the items and amounts claimed in the set-off are identical with the items and amounts claimed to be embezzled, but whether treated as an independent assumpsit, or as evidence that Braun had wrongfully appropriated those sums to his own use, the burden was upon the defendant to prove such debt or appropriation. To meet that burden appellant was obliged to show that Braun had received money for the use of the corporation which it never received, and for which he did not account, or that he had wrongfully and fraudulently abstracted and converted to his own use funds of the corporation which had actually come into its possession.

To prove that, appellant offered evidence tending to show that Braun had received checks from the Davison Chemical Company and the Carolina Steamship Company aggregating $4,200, which, while deposited to the credit of the company, were not properly applied, in that, instead of crediting the accounts to which they were applicable with the payments, they were entered on the books as payments on other accounts which appeared in the books to be unpaid, but which in fact had been paid. The evidence that the payments had been made, and that they were not properly credited to the accounts to which they should have been applied, was direct, positive, and undisputed. But at the same time it appeared that they were allocated to other accounts. So that, while it showed false bookkeeping and improper entries, the record did not show anything more. That is, it showed that the company had received the money, which had not been credited to the persons who paid it, but it did not necessarily show that Braun had himself received that money, or that he had received or abstracted funds from the accounts to which the payments were actually applied, or that he retained any part of them. That fact, if it was a fact, in the absence of direct evidence, should have been shown by a complete audit of the appellant's books over so much of the period of Braun's

management as was needed to show whether at his death he had received more money for its use than he had accounted for. Such an audit could not usefully have been made in the course of the trial, but the court had ample authority under Code, art. 26, sec. 9, to have referred the case to an auditor for an account, and, if that had been done, much of the confusion and uncertainty which characterizes the evidence which was taken, could have been avoided. But in the absence of such an audit, on the evidence before this court, it cannot be said as a matter of law that Braun either abstracted or converted to his own use the payments aggregating $4,200.

The appellant kept in its books two accounts called respectively, "Temporary Account" and "Trip Account." Besio, the auditor, testified that the "Temporary Account" was a "wash account" used in practically every set of books, where entries are made temporarily to be later carried to the accounts to which properly they belong. The "Trip Account," recorded receipts and disbursements of Braun in connection with his traveling expenses when on the appellant's business. Appellant offered evidence to show that Braun had drawn against the "Temporary Account" $375.50 more than he had put in it, and that he had drawn from the "Trip Account" $43.85 more than he was entitled to receive, and its contention is that that evidence shows as a matter of law that Braun had embezzled those sums from his employer.

Besio, the auditor, referring to the "Temporary Account" said "that this was an account in which entries were temporarily made; it is where temporary entries are made and subsequently taken out and put into accounts where they properly belong. 'It is a wash account, as we call it.' Such an account is used in practically every set of books. Either receipts or disbursements could be carried to that account. Checks were drawn on the funds of the company by Braun and charged to that account. Mr. Braun would draw on that account. Up until July, 1928, Mr. Braun was the sole signer of the checks. Witness knows that from his own knowledge, because he has examined the checks. The total

number of checks drawn and charged in 'Temporary Account' to Mr. Braun, by and to Mr. Braun, was $4,702.51. This total of $4,702.51 is made up of items shown in the books of the corporation, that is, from the ledger, which is the summary book, the general ledger, which shows these amounts, supported by the cash book and the journal, books of original entry, made from the actual deposits and from the check stubs. Witness referred to the checks previously offered in evidence, totaling $4,702.51, being the total of checks drawn against 'Temporary Account' by Mr. Braun. The witness, referring to the 'Trip Account,' said that the total of $3,380 charged to Braun was made up of the cancelled checks offered earlier in the trial. Witness further testified that Mr. Braun's 'Temporary Account' had been credited with twenty-six items, totalling $4,327.01."

Catherine Snader, a bookkeeper, said: "If money was drawn with no particular charge account, any of the ledgers for it, no particular account, then it was entered in the temporary account until it was cleared up or disposed of. * * * For instance, if Mr. Braun wanted to draw a hundred dollars for purposes of his own and didn't have any particular account, he could charge that in the ledger if it wasn't for a trip or some reason, it was charged in the temporary account with the intention of being repaid to that later. * * * The money that was drawn was to be charged to this account, as I say, and then when it was applied to any particular item, charged to any particular account or any other account, then this item was closed out in the temporary account and charged to expense or rent or whatever the money was appropriated for. Q. Who determined how to do that, you? A. Mr. Braun. Q. You have charged the temporary account a hundred dollars for travelling expenses. Mr. Braun at some time would come there and say to you, 'You charge that item to such and such an account?' A. Yes, he did. Q. And you would do it? A. Yes. * * * (The Court): I am trying to find out what that temporary account means. (The Witness): It means it took the place of any other account. Items were entered in it

where they couldn't put it any other account, that weren't clearly expense or entertainment or premiums, things like that. It was just a miscellaneous account, you might say."

Dorothy E. Morton, who succeeded Miss Snader, as bookkeeper, said that on November 28, 1930, she called Braun's attention to the fact that the "Temporary Account" showed a balance against him of $1,005.50 and asked him to "bring it up to date"; that he then gave her his personal check for $630 on the Union Trust Company. She later amended that statement and said that he had given her two checks, one for $600 on the Union Trust Company, and one for $30 on the Mercantile Trust Company, and from other evidence it appeared that Braun had no account with the Union Trust Company. She further said that she made out a deposit slip listing both checks. A deposit slip dated November 29th, 1930, and an entry in the "Temporary Account," showed that on the same day the account was charged with $630. On November 29th, 1930, there was actually deposited a check for $600 of the Davison Chemical Company on the Union Trust Company and Braun's personal check for $30 on the Mercantile Trust Company. The witness said that she did not at that time see the $600 check of the Davison Chemical Company, and it does not appear from anything in the record that the chemical company was then credited with the payment made by it.

The contention that the evidence shows as a matter of law that Braun had taken from the "Trip Account" $43.85 more than he was entitled to receive is based apparently upon the facts that the account showed a debit balance of that amount against him, and that all of the funds drawn by him were not vouchered. In connection with that account Besio said: "Q. What I am getting at is this, if, for instance, he drew $3,380 and actually spent $3,380? A. There would be entries in the account for that. Q. Wait a minute. There wouldn't be any objection to it? A. No. Q. But you say you found record that he drew $3,380 and you don't find any record for actual expenses excepting $1,601.75? A. That's right. Q. And that is all the record you find? A. Yes.

Q. And therefore you claim the difference between $1,601.75 and $3,380 simply because you don't find vouchers there for the difference? A. That's right. Referring again to 'Trip Account' the total deposits in that account—including expenses properly offset, amount to $3,336.15, including deposit of own and corporate funds of $1,734.40, leaving net charge against Mr. Braun in trip account of $43.85."

Giving to all the evidence in the case the effect required by a consideration of the prayers under consideration, it cannot be said as a matter of law that it showed that Braun had "misappropriated" the debit balances against him in these two accounts. For when the nature of the accounts and Braun's connection with them as described by the auditor and the bookkeepers are considered, it cannot be definitely and finally said that these debits showed dishonest or unauthorized misappropriations, any more than that they were the result of slovenly bookkeeping. Passing certain discrepancies in the testimony, which the jury would have been entitled to consider in weighing its credibility, the whole evidence was too vague and incomplete to justify such a conclusion. If Braun did in fact receive funds belonging to the appellant, which he embezzled or wrongfully appropriated, that fact could have been shown by an audit of the receipts and expenditures of the company while he managed it, or by direct proof of such misappropriations. But in the absence of such proof, the evidence which is in the record does not support the view that as a matter of law it proves that Braun was guilty of misappropriating appellant's funds. But apart from that, the burden of showing such misappropriation was upon the appellant, and, as was said in *Travelers Ins. Co. v. Connolly*, 145 Md. 565, 125 A. 900, 905: "In this state, where the burden is upon one to prove a fact, it is not for the court to say whether that burden has been met, and to withdraw a case from the jury, at the instance of him upon whom the burden rests. *Calvert Bank v. Katz*, 102 Md. 56, 61 A. 411; *Lemp Brewing Co. v. Mantz*, 120 Md. 176, 87 A. 814; *Jewel Tea Co. v. Weber*, 132 Md. 178, 103 A. 476; *Beasman v. Butler*, 133 Md. 382, 105 A. 409; *Bell*

*v. Steen,* 137 Md. 388, 112 A. 584; *Taylor v. Robert Ramsay Co.,* 139 Md. 113, 114 A. 830."

The appellant's A, B, C, D, and E prayers were therefore properly refused.

Turning to the jury prayers, there was error in granting "Court's Instruction No. 2," "(at request of plaintiff)" and "Court's Instruction No. 1." The effect of the No. 2 prayer was to instruct the jury that, if they were unable on the evidence to find for the defendant under the plea of set-off, they were bound to find for the plaintiff under the agreement. There was in the case evidence to warrant the inference that Braun had so juggled and falsified appellant's accounts that it was impossible for the jury to determine with certainty the true state of the accounts between it and Braun. And while as a result of such conduct the jury may not have been able to determine whether there was such an indebtedness or, if there was, what it amounted to, nevertheless such conduct on Braun's part would, if done with a fraudulent intent, have been such a violation of the express terms of the agreement as would have supported a verdict in its favor, unless waived or condoned by it, and since the prayer withdrew that defense from the jury it should have been refused. "Court's Instruction No. 1" should also have been refused, because it ignored that defense and the defense of fraud in the appropriation of defendant's funds by Braun postulated by the prayer.

Appellant's first six prayers were properly refused because they ignored the evidence in the case from which waiver or condonation may have been inferred. It appeared that appellant audited Braun's books annually, reports prepared by bookkeepers were frequently sent to the parent company in New York, and Braun was continued in appellant's employment under the agreement until his death, and under the agreement he was bound to observe all directions given him by the officers of the parent company. All this afforded some evidence of condonation or waiver which should have been submitted to the jury.

Its seventh prayer stated clearly and accurately the law applicable to the issue of set-off and should have been granted. Its eighth prayer prevented a recovery if "Johnson & Higgins (Maryland), Inc.," learned of the supposed misappropriations for the first time after the death of Braun. That proviso would have made the plaintiff's right to recover depend upon knowledge of his supposed appropriations by the Maryland corporation, whereas under the agreement he was subject to the orders and direction of the New Jersey corporation, which, except for qualifying shares, held all the stock in the Maryland corporation, and exercised ultimate and complete control over it. Under those circumstances that company was empowered to waive or condone any irregularities by employees of the Maryland corporation as fully as the latter corporation itself could. To that extent and for that reason alone the prayer was defective and was properly refused.

For the errors indicated the judgment appealed from must be reversed.

*Judgment reversed with costs, and case remanded for a new trial.*